T.C. Memo. 2012-72


UNITED STATES TAX COURT


JAMES E. BUTLER, JR., AND SUSAN C. BUTLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1752-09.                    Filed March 19, 2012.


<u>David D. Aughtry</u>, <u>William E. Buchanan</u>, <u>Kristen S. Lowther</u>, and <u>Alan F. Rothschild, Jr.</u>, for petitioners.

<u>John T. Arthur</u>, <u>Jeffrey S. Luechtefeld</u>, and <u>Christopher Pavilonis</u>, for respondent.

## MEMORANDUM OPINION

WELLS, <u>Judge</u>:  Respondent determined income tax deficiencies of $2,525,213 and $694,694, and penalties pursuant to section 6662(a)[1] of $505,042.60 and $138,938.80 with respect to petitioners' 2003 and 2004 tax years (years in issue), respectively.  The issues we must decide are:  (1) whether the conservation easements petitioners donated to Chattahoochee Valley Land Trust (CVLT) with respect to two properties near Columbus, Georgia, constitute qualified conservation contributions pursuant to section 170(h); (2) the proper values of those conservation contributions; (3) whether the conservation easements petitioners donated to Chattowah Open Land Trust (COLT) with respect to property in Early and Calhoun Counties, Georgia, constitute qualified conservation contributions pursuant to section 170(h); (4) the proper value of those conservation contributions; and (5) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

For convenience, we proceed first with general background findings of fact and then combine our remaining findings of fact with respect to each separate issue with our opinion regarding each of those issues.

General Background

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated in this opinion by reference and are found accordingly. At the time they filed their petition, petitioners resided in Georgia.

Petitioner James E. Butler has long been interested in conservation. During the late 1980s, Mr. Butler offered his services pro bono as lead counsel in litigation that successfully prevented the construction of a hazardous waste incinerator in Taylor County, Georgia. During the late 1990s, Mr. Butler served on the Georgia Board of Natural Resources. During the early 2000s, Mr. Butler and several other individuals founded CVLT, and Mr. Butler served on its board.

The purpose of forming CVLT was to encourage landowners to donate conservation easements to the organization. In part to encourage other landowners to contribute easements on their properties, during 2003, Mr. Butler contributed a conservation easement to CVLT on 393.33 acres of his property in Muscogee County outside of Columbus, Georgia. At the same time, petitioner Susan C. Butler contributed a conservation easement to CVLT on 12.7 acres of her property

across Hubbard Road from Mr. Butler's property in Muscogee County. We refer to the foregoing properties as the Muscogee County properties. Before petitioners contributed those conservation easements, Mr. Butler resigned from the board of CVLT.

During the years in issue, petitioners owned all of the interests in Kolomoki Plantation, L.L.C. (L.L.C.), a Georgia limited liability company with its principal place of business in Georgia. During 2003, the L.L.C. contributed a conservation easement on 1,780 acres of property in Calhoun and Early Counties, Georgia. We shall refer to the property the L.L.C. owned in Calhoun and Early Counties as Kolomoki Plantation or Kolomoki. The L.L.C. contributed the easement on Kolomoki Plantation to COLT. COLT has since changed its name to the Georgia Land Trust, but it still operates as COLT for purposes of monitoring easements that were donated before the organization changed its name. During 2004, the L.L.C. contributed a conservation easement to COLT on an additional 2,450 acres of Kolomoki Plantation. The L.L.C. passed through to petitioners the charitable contribution deductions with respect to its donations during 2003 and 2004, and petitioners claimed those deductions on their joint return for each year.[2]

---

[2]The unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 401, 96 Stat. at

(continued...)

Throughout the process of donating the conservation easements, Mr. Butler relied upon Alan Rothschild, Jr., an attorney with the Columbus, Georgia, law firm Hatcher Stubbs, and Charles D. Johnson, C.P.A. Mr. Butler has relied upon and worked with Mr. Rothschild for many years. Mr. Johnson has served as Mr. Butler's accountant for more than two decades. Mr. Butler engaged Conservation Advisors, L.L.C. (Conservation Advisors), a real estate firm specializing in conservation conveyances, to advise him regarding the process of donating the conservation easements. Conservation Advisors helped petitioners plan and execute the steps needed to donate the easements, including the engagement of environmental consultants and appraisers. Mr. Rothschild reviewed and revised the deeds of conservation easement (conservation deeds) and related documents on behalf of petitioners and the L.L.C.

Petitioners timely filed their individual income tax returns for the years in issue. They attached to their income tax returns appraisal reports with respect to the conservation easements. The L.L.C. timely filed Forms 1065, U.S. Return of

---

[2](...continued)

648, do not apply to the L.L.C. because it qualifies as a small partnership under sec. 6231(a)(1)(B)(i) and did not elect pursuant to sec. 6231(a)(1)(B)(ii) to have TEFRA apply. See Wadsworth v. Commissioner, T.C. Memo. 2007-46.

Partnership Income, for the years in issue. It attached to those returns appraisal reports for the conservation easements on the Kolomoki property.

The appraisal reports submitted with the returns filed by petitioners and the L.L.C. determined that the proper values of the conservation easements with respect to each of the properties were as follows:

| | Muscogee County properties | | Kolomoki Plantation | |
| | James Butler | Susan Butler | 2003 | 2004 |
|---|---|---|---|---|
| Before | $6,520,000 | $294,000 | $14,693,000 | $13,139,000 |
| After | 1,799,000 | 103,000 | 12,143,000 | 10,157,235 |
| Enhancement | 37,000 | [1]7,000 | -0- | 45,600 |
| Easement value | 4,684,000 | 191,000 | 2,550,000 | [2]2,936,000 |

[1]The $7,000 enhancement is already reflected in the after value of $103,000.
[2]The appraiser rounded this number in his report.

Mr. Johnson handled the preparation and filing of petitioners' 2003 and 2004 income tax returns. Relying primarily upon Mr. Johnson and Mr. Rothschild, Mr. Butler read the first several pages of his tax return and skimmed the rest of it but did not review it in detail. He read at least one of the appraisal reports for the Kolomoki Plantation conservation easements, but he does not remember reading any of the other reports.

After conducting an examination of petitioners' 2003 and 2004 income tax returns, respondent determined that petitioners failed to establish that their

contributions of conservation easements to CVLT and COLT were qualified conservation contributions pursuant to section 170(h).  In the alternative, respondent determined that the appraisal reports submitted by petitioners failed to establish the proper value of the conservation easements.[3]  Respondent timely issued a notice of deficiency to petitioners.  Petitioners timely filed a petition with this Court.

Allocation of the Burden of Proof

As a preliminary matter, we consider petitioners' contention that the burden of proof has shifted to respondent pursuant to section 7491(a).  Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a)(1) provides an exception that places the burden of proof on the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if:  (1) the taxpayer introduces credible evidence with respect to that issue; and (2) the taxpayer satisfies certain other conditions, including substantiation of any item and cooperation with the Commissioner's requests for witnesses, documents, other information, and meetings.  Sec.

---

[3]However, respondent did not argue at trial or in his briefs that petitioners failed to submit qualified appraisals with their returns.  See sec. 1.170A-13(c)(2), Income Tax Regs.

7491(a)(2); see also Rule 142(a)(2).  The taxpayer bears the burden of proving that the taxpayer has met the requirements of section 7491(a).  Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, ___ F.3d ___ (7th Cir. Feb. 8, 2012).

At trial, respondent conceded that petitioners fully cooperated during respondent's examination of their returns.  Accordingly, the requirements of section 7491(a)(2)(B) have been met.  However, respondent contends that petitioners have not introduced credible evidence with respect to any of the factual issues in the case.  Respondent contends that all the evidence petitioners submitted either fails to address the issues or lacks credibility.

We must decide whether petitioners introduced "credible evidence" with respect to each of the factual issues.  For purposes of section 7491(a)(1), "credible evidence" means "'evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness).'"  Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005) (quoting Griffin v. Commissioner, 315 F.3d 1017, 1021 (8th Cir. 2003), rev'g T.C. Memo. 2002-6), aff'g T.C. Memo. 2003-212; see also Geiger v. Commissioner, 279 Fed. Appx. 834, 835 (11th Cir. 2008), aff'g T.C. Memo. 2006-271; Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001).

As we explain below, we conclude that petitioners produced credible evidence as required by section 7491(a) with respect to the factual issues regarding whether their conservation easements satisfied the requirements of section 170(h). With respect to those issues, therefore, the burden of proof shifts to respondent pursuant to section 7491(a)(1). Because both sides presented extensive evidence regarding the factual issues relating to the valuation of the conservation easements and we decide those issues on the basis of a preponderance of the evidence, the allocation of the burden of proof on those issues is immaterial. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).[4]

Issue 1. Whether Petitioners' Contribution of a Conservation Easement on the Muscogee County Properties Was a Qualified Conservation Contribution Under Section 170(h)

Background

Through numerous purchases over the course of about 25 years, Mr. Butler assembled a contiguous parcel of land totaling approximately 418 acres. The property is situated south of Smith Road, east of Whitesville Road, and north of Hubbard Road in Muscogee County, Georgia, north of the city of Columbus. The property is about a half-mile west of Interstate 185 and just south of the Harris

---

[4]Accordingly, we need not address petitioners' alternative argument that the burden of proof should shift to respondent because respondent's notice of deficiency was "excessive and erroneous".

County line. Looking east from Whitesville Road, the property's irregular shape vaguely resembles a fox with its mouth open: two small portions of the property abut Smith Road to the north (the mouth); three small portions abut Whitesville Road to the east (the legs); and a larger portion abuts Hubbard Road to the south (the bushy tail). Pritchett Road, a dead-end road, bisects the property. Petitioners constructed an estate-style residence on approximately 24.5 acres on the north side of Pritchett Road (Butler estate). That portion of the property constituting the Butler estate is not subject to the easement. The parties refer to the tract of land assembled by Mr. Butler as the James Butler property. We will also use that appellation, but we do not include the Butler estate when we refer to the James Butler property.

The remainder of the James Butler property is undeveloped, with the exception of two existing residences. The property includes both pastureland and forested areas. The topography is rolling, with steeper slopes in the portion of the tract north of the Butler estate. The steepest hills are in the northwest corner and along the northeast boundary of the tract. The southern portion, just north of Hubbard Road, is gently rolling. That portion is unusually flat for northwestern Muscogee County. The southern portion is also less rocky than the northern

portion. During 2003, the James Butler property had access to sewer and water only along the southeastern corner of the property on Hubbard Road.

In addition to the James Butler property, petitioners' Muscogee County properties also include a 12.7-acre, roughly rectangular tract just south of Hubbard Road. Ms. Butler purchased that property during the 1980s. The parties refer to that tract as the Susan Butler property. The Susan Butler property is moderately sloped toward the south and west, where it borders two creeks. During 2003, it had access to water and sewer along Hubbard Road. The Susan Butler property is undeveloped.

Columbus is one of the largest cities in Georgia. At the time of the 2000 census, the population of Muscogee County was 186,291. During the early 2000s, the population in and around Columbus was growing, and the primary direction of development growth was to the north of Columbus, in the area between Pierce Chapel Road (about five miles east of Interstate 185) to the east and the Chattahoochee River to the west. The northeastern part of Muscogee County was also growing, but property there was not as desirable because access to downtown Columbus was not as easy. Similarly, Harris County to the north was growing but not as rapidly because of its distance from downtown Columbus and because it had fewer amenities and services.

Although the neighborhood of the James Butler property remained rural and was only 35% developed during 2003, it was becoming attractive to developers as a result of the pattern of growth in Muscogee County. During 2003, Mr. Butler received three unsolicited offers from developers who wanted to purchase a small portion of that property. On July 18, 2003, William White of Sedgefield Properties, L.L.C., offered to purchase 75 acres along Hubbard Road for $17,500 per acre. The 75-acre portion of the property Mr. White wanted to purchase was the southernmost portion of the James Butler property, a portion shaped roughly like a square fronting Hubbard Road. That portion was south of Pritchett Road, separated from Pritchett Road by another 40-acre tract owned by Mr. Butler that Mr. White did not offer to purchase. After Mr. Butler declined that offer, Mr. White offered to purchase a 42-acre subset of that 75-acre tract for $20,000 per acre. Mr. Butler again declined to sell. On August 21, 2003, another developer, Kenneth Brown of Leary & Brown, Inc., offered to purchase the same 42-acre tract, the southernmost portion of the James Butler property, for $33,000 per acre. Mr. Butler also refused that offer.

Mr. Butler was not interested in selling his land to developers because he wanted to preserve it. On November 25, 2003, petitioners conveyed conservation easements to CVLT on the Muscogee County properties. The conservation

easements cover the entirety of the Susan Butler property and 393.33 acres of the 418-acre tract (i.e., the James Butler property but not the Butler estate).

Although the conservation deeds significantly restrict petitioners' use of the Muscogee County properties, they permit limited agricultural and recreational use and reserve a total of 12 lots for development. Both of the conservation deeds begin with nearly identical recitals, proclaiming general conservation purposes. The conservation deeds then provide certain rights and duties to the grantor and grantee. A list of permitted uses and practices labeled "Exhibit 'B'" is attached to the conservation deeds and provides:

> The following uses and practices, though not an exhaustive recital of permitted uses and practices, are hereby deemed to be consistent with the Purpose and are expressly permitted.

> 1. Agricultural activities. To conduct small scale farming, ranching, or other agricultural activities including raising, managing and breeding livestock and planting, raising and harvesting agricultural crops. However, there shall be no large scale agricultural activities permitted on the Property such as feedlots, pig farms, commercial poultry farms, or similar uses which have the potential to negatively impact the Conservation Values.

> \* \* \* \* \* \* \*

> 3. Water resources. To maintain, enhance, and develop water resources on the Property in accordance with applicable state and federal regulations, for permitted agricultural uses, fish and wildlife uses, domestic needs and private recreation. Permitted uses include, but are not limited to, the following: the right to restore, enhance and develop water resources, including ponds; to locate, construct, repair, and maintain irrigation

systems; to develop animal watering facilities; and to construct, repair and maintain dams, spillways, docks, gazebos and related recreational structure appurtenant thereto.

* * * * * * *

6. Maintenance and structures. To maintain, repair, remodel, and make limited additions to any existing or subsequently constructed structures and improvements expressly permitted by this Easement. * * * Grantor reserves and retains the right to construct, maintain and repair a single family residence, garage and barn or single multipurpose outbuilding on each of the eleven (11) two-acre building sites shown in the Baseline Documentation (the "Building Sites"). Reconfiguration of the Building Sites, but not expansion, may be permitted if Grantor requests in writing and Grantee approves such reconfiguration. Grantor further reserves and retains the right to construct, maintain and repair structures ancillary to the uses permitted in paragraphs 1 and 2 above [agricultural and recreational uses], such as a cattle barn, horse barn, and sheds, so long as such structures do not materially impair the Conservation Values.

The conservation deed with respect to the Susan Butler property reserves only 1 two-acre building site, not the 11 reserved on the James Butler property.

In addition to the permitted uses described above, both conservation deeds permit commercial timber harvesting provided that CVLT approves the timber management plan submitted by the grantor. They also permit the removal of trees for agricultural or aesthetic purposes and the planting of nonnative species without any approval from the grantee. Additionally, the conservation deeds expressly permit a wide variety of recreational activities such as noncommercial hunting, fishing, horseback riding, boating, and hiking; the construction of fences provided

that they do not result in "demonstrable degradation to the Conservation Values"; the construction of roads and trails to access permitted building sites and to accommodate timber management; and the use of agrichemicals "using methods and dosages which achieve the desired result while minimizing the impact upon non-noxious foliage and vegetation." The grantor is permitted to sell any or all of the permitted building sites and any other portion of the property subject to the easement.

The conservation deeds require that the grantor notify CVLT before undertaking some of the permitted actions (but no notice is required with respect to others), provide that any costs of enforcing the conservation deeds will be paid by the grantor, and provide that the grantor waives any defense of laches, estoppel, or prescription. The conservation deeds also provide that CVLT has the right, upon prior notice to the grantor, to enter the property to monitor compliance with the terms of the conservation deeds. CVLT is empowered to require the restoration by the grantor of any portion of the property damaged by a violation of the conservation deeds. Since the donation of the conservation easements during 2003, CVLT has been monitoring the Muscogee County properties annually to ensure that the conservation values are not being damaged by any uses of the properties inconsistent with the conservation deeds.

The conservation deeds contain a list of prohibited uses in "Exhibit 'C'". That list includes uses such as mineral exploitation, "commercial or industrial facilities (other than those necessary in the operation or uses of the Property expressly permitted by this Easement)", dumping, billboards, commercial towers, and mobile homes or recreational vehicles (except for temporary parking). The conservation deeds do not permit the general public to access the properties.

The conservation deeds state that if any of their provisions are found ambiguous, "an interpretation consistent with the Purpose and said Code Sections that would render the provision valid shall be favored over any interpretation that would render it invalid."

The "Baseline Documents" to which the conservation deeds refer consist of reports prepared by environmental consultants Stacy Mote and Erin Bouthillier (collectively, environmental consultants). We shall refer to those documents as the environmental reports. The environmental reports state that the environmental consultants were engaged for the purpose of conducting a "baseline environmental inventory" so that "an assessment of [each] * * * property's natural importance can be made and future management and monitoring practices can be evaluated." Consistent with that purpose, the environmental reports describe the natural features of the Muscogee County properties at the time of the easement

contributions.  Regarding the conservation value of the James Butler property, the environmental report with respect to that property states:

> Overall, the * * * Property provides a significant wildlife resource for the region and enhances the natural aesthetics of the area.  With access to a major waterway corridor and a variety of ecological communities, this site offers forage, nesting habitat, and shelter.  * * *  All of these functions and values are also beneficial to the public in the form of cleaner air and water; plentiful game for hunting; and natural beauty in the area.

The environmental report with respect to the Susan Butler property uses identical language to describe its ecological value.  The environmental reports provide a list of wildlife species that Ms. Mote and Ms. Bouthillier observed on the properties and a list of wildlife species that have been observed by others in the general area of the properties that normally live in habitats similar to the habitat provided by the properties.  The reports state that the properties, in their then-current state, provide habitat similar to the habitat preferred by several wildlife species listed as threatened or endangered.  However, the environmental consultants did not actually observe any endangered species on the Muscogee County properties, and the only threatened species they observed was the plumleaf azalea, which the State of Georgia considers threatened.

With respect to the James Butler property, the environmental report notes that timber and agricultural activities have "altered some of the native plant

communities" and that a small herd of horses kept on the property "may have a limited impact on Heiferhorn Creek; however, by keeping the herd small and limiting the access to a small portion of the creek, water quality impacts should be minimal." That report also notes that the larger tract has been used for grazing livestock and harvesting in the recent past and that, although those practices "have impacted the natural communities on-site", they "have also provided a diversification in habitat that may have not occurred previously."

The environmental reports provide the following conclusions and recommendations (using identical language in both reports):

> The preservation of the Butler Tract will be valuable in protecting the unique natural resources in this rapidly developing area. Heiferhorn Creek and its drainage ways are important water features that serve to attract wildlife, filter pollutants, and recharge groundwater * * *. These waterways also have a high likelihood of supporting federally and state protected mussel and fish species. The many habitats on-site host a wide variety of plant and animal species. * * *

> With limited development of the property, the wildlife components of this site will continue to flourish. In order to minimize future impacts, we recommend that all timber practices comply with Forestry Best Management Practices, keeping stream management zones and using suitable erosion control techniques.

Except for those brief conclusions, the environmental reports do not address how the conservation value of the properties would be affected by the permitted uses described in the conservation deeds.

Petitioners later submitted supplemental environmental reports, also authored by Ms. Bouthillier and Ms. Mote, during 2010 (supplemental environmental reports). The supplemental environmental reports include a new section in which the environmental consultants more specifically address how the conservation deeds protect conservation purposes as provided in the Code and the regulations. The supplemental environmental reports specifically identify certain high quality terrestrial and aquatic communities found on the properties:

> During the 2002 surveys, high quality terrestrial communities were identified on the Butler Tract in the northern portion of the site and along the ridge/slopes paralleling the drainageways. These communities were Oak-Hickory-Pine Forests and Granite Outcrops further described in the Baseline Report as Mixed Upland Forest and Rock Outcrops. The rocky character of these significant habitats made it difficult to farm or timber over the years; thus allowing a more mature canopy of hardwoods to persist. The rocky substrate also provides habitat for several of the species listed above.

> Oak-Hickory-Pine Forest was observed in the northern portion of the easement and along tributaries throughout the site. Numerous wildlife species, including migratory songbirds, were observed utilizing this valuable habitat for feeding and nesting. The slopes within this habitat transition between gently sloping to steep hillsides scattered with rock outcrops. Oak-Hickory-Pine Forests within the Piedmont ecoregion have been primarily impacted by urban sprawl within the last twenty years.

> Rock Outcrops were found within the steep slopes of the upland hardwood forest located north of the main lake and along Heiferhorn Creek. Vernal pools within shallow depressions of these outcrops provide habitat to fragile ecosystems within Georgia. Decline of many species that rely on this type of habitat is occurring throughout Georgia due to lack of habitat

protection. These outcrops provide potential habitat for granite stonecrop and pool sprite.

The 2002 surveys also identified high quality aquatic communities in Heiferhorn Creek, its tributaries, and associated floodplain hardwood. Heiferhorn Creek is located within the 7 mile radius of a water supply source and has been afforded additional protection in this portion of the County. This large waterway flows south to southwest along the eastern boundaries of the Butler Tract eventually discharging into the Chattahoochee River Basin. Heiferhorn Creek and its tributaries are meandering systems with series of run/riffle/pool habitats. Several areas of rocky shoals provide foraging areas and habitat for protected species. Native plumleaf azalea populations (Rhododendron prunifolium), a threatened State Species, were observed along stream courses throughout the Property.

The environmental consultants found only one rare, endangered, or threatened species on the Muscogee County properties: the plumleaf azalea, a plant that grows in the moist soils of ravines in hardwood forests. However, the environmental consultants reported that the following rare, endangered, or threatened species may be found in habitats similar to those found on the Muscogee County properties: granite stonecrop (a plant found in partially shaded granite outcrops); relict trillium (a plant found in ravines in hardwood forests); shoals spiderlilly (a plant found in rocky shoals of major streams); Alabama milkvine (a plant found on slopes and bluffs in dense hardwood forests); Bachman's sparrow (a bird found in open pine woods and old pastures with dense

ground cover); and alligator snapping turtle (a reptile found in rivers, lakes, swamps, and large ponds).

The supplemental environmental reports do not mention any of petitioners' retained rights besides the following brief discussion of the reserved building sites: "Even with the retained rights of 11 2-acre home sites, the * * * [James Butler property] would maintain the scale of rural residential open space historically present in the region." The supplemental environmental report for the Susan Butler property included a similar conclusion about the effect of the single two-acre home site reserved on that property.

## Discussion

### A.   Legal Standard

Taxpayers may deduct the value of any charitable contributions made during the tax year pursuant to section 170(a)(1). Generally, taxpayers are not entitled to deduct gifts of property that consist of less than the taxpayers' entire interest in that property. Sec. 170(f)(3). However, taxpayers are permitted to deduct the value of a contribution of a partial interest in property that constitutes a "qualified conservation contribution" as defined in section 170(h)(1). Sec. 170(f)(3)(B)(iii). For a contribution to constitute a qualified conservation contribution, the taxpayer must show that the contribution is (1) of a "qualified

real property interest" (2) to a "qualified organization" (3) "exclusively for conservation purposes." Sec. 170(h)(1). The parties agree that the contributions petitioners made were of qualified real property interests and that those contributions were made to qualified organizations. Accordingly, the only issue remaining for us to decide is whether those contributions were exclusively for conservation purposes.

To be considered to have been made exclusively for conservation purposes, a contribution must satisfy the requirements of section 170(h)(4) and (5). Section 170(h)(4)(A) defines "conservation purpose" as:

> (i) the preservation of land areas for outdoor recreation by, or the education of, the general public,
>
> (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,
>
> (iii) the preservation of open space (including farmland and forest land) where such preservation is--
>
>> (I) for the scenic enjoyment of the general public, or
>>
>> (II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit, or
>
> (iv) the preservation of an historically important land area or a certified historic structure.

In order for a contribution to be deductible, it must satisfy one of the contribution purposes under section 170(h)(4). Section 170(h)(5) provides that no contribution will be treated as exclusively for a conservation purpose unless that purpose is preserved in perpetuity.

Section 1.170A-14(e)(2), Income Tax Regs., disallows any deduction where the conservation easement would preserve one of the conservation purposes "but would permit destruction of other significant conservation interests."

> For example, the preservation of farmland pursuant to a State program for flood prevention and control would not qualify under paragraph (d)(4) of this section if under the terms of the contribution a significant naturally occurring ecosystem could be injured or destroyed by the use of pesticides in the operation of the farm. However, this requirement is not intended to prohibit uses of the property, such as selective timber harvesting or selective farming if, under the circumstances, those uses do not impair significant conservation interests.

Id.

The parties agree that petitioners' contributions do not satisfy the requirement of section 170(h)(4)(A)(i) or (iv). Petitioners contend that they satisfy the requirements of the second and third conservation purposes listed in section 170(h)(4)(A). Respondent disagrees and contends that the rights petitioners retained under the conservation deeds are inconsistent with the conservation purposes listed in section 170(h)(4)(A)(ii) and (iii). Respondent focuses on the

extent to which development of the tracts is explicitly permitted by the conservation deeds.  Petitioners contend that, although the conservation deeds reserve some rights for petitioners, they include language that ensures the conservation purposes will be protected.  Because, as we explain below, we conclude that petitioners' contributions satisfy the section 170(h)(4)(A)(ii) conservation purpose of protecting a relatively natural habitat (conservation purpose), we need not address whether the contributions protect open space pursuant to clause (iii).

To qualify for the conservation purpose of protecting a relatively natural habitat under section 170(h)(4)(A)(ii), the regulations require that the donation:

> protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives will meet the conservation purposes test of this section.  The fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state. * * *

Sec. 1.170A-14(d)(3)(i), Income Tax Regs.  The regulations offer the following guidance with respect to what constitutes a "significant habitat or ecosystem":

> Significant habitats and ecosystems include, but are not limited to, habitats for rare, endangered, or threatened species of animal, fish, or plants; natural areas that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact; and natural areas which are included in, or which contribute to, the ecological viability of a

local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

Sec. 1.170A-14(d)(3)(ii), Income Tax Regs.  A "habitat" is an "'area or environment where an organism or ecological community normally lives or occurs'" or the "'place where a person or thing is most likely to be found.'"  Glass v. Commissioner, 124 T.C. 258, 281-282 (2005) (quoting the American Heritage Dictionary of the English Language 786 (4th ed. 2000)), aff'd, 471 F.3d 698 (6th Cir. 2006).

Pursuant to the regulations cited above, a conservation easement will satisfy the conservation purpose of protecting a relatively natural habitat under section 170(h)(4)(A)(ii) if it protects an area (1) that is an environment where a rare, endangered, or threatened species is normally found; (2) that is a "high quality" example of an ecosystem; or (3) that contributes to the ecological viability of a park or other conservation area.  Sec. 1.170A-14(d)(3)(ii), Income Tax Regs.

Any interest retained by the donor "must be subject to legally enforceable restrictions * * * that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation."  Sec. 1.170A-14(g)(1), Income Tax Regs.  When the donor reserves rights that, if exercised, would have the potential to impair conservation interests, the donor must provide the donee with

"documentation sufficient to establish the condition of the property at the time of the gift." Sec. 1.170A-14(g)(5), Income Tax Regs. The donee must also be given the right to periodically inspect the property and to enforce the conservation restrictions, including the right to require the restoration of the property to its condition at the time of the donation. Id.

In deciding whether the conservation deeds preserve the conservation purpose in perpetuity, we must first decide the extent to which the conservation deeds permit the properties to be altered from their current state. The second issue we must decide is: If the properties were developed to the extent permitted by the conservation deeds, would the conservation purpose still be preserved?

B.      What Rights Are Reserved Under the Conservation Deeds?

As detailed above, the conservation deeds reserve numerous rights for petitioners, subject to the overarching language of the conservation deeds preserving the conservation purposes. Under the terms of the conservation deeds, petitioners or future owners may partition the James Butler property into 11 smaller tracts averaging 36 acres, each of which would include a 2-acre building site on which a home and a garage could be constructed. Petitioners similarly retain the right to build on one two-acre building site on the Susan Butler property. The deeds permit the construction of roads or driveways to access the buildings.

Petitioners or future landowners may operate small-scale farms, both keeping livestock and raising crops. On those farms, they may use agrichemicals to eliminate "noxious weeds" subject only to the exhortation that they "minimiz[e] the impact upon non-noxious foliage and vegetation". They may construct dams to create ponds for recreation or irrigation, and they may construct docks, gazebos, and "related recreational structures". They may clear timber for agricultural uses, clear brush and remove trees for "aesthetic" purposes, and plant nonnative species of trees or other plants.

In addition to those rights, the conservation deeds also permit a wide variety of other uses provided that those uses do not result in "demonstrable degradation to the Conservation Values". Such conditionally permitted uses include the construction of fences, the construction of other roads besides those that access the building sites, the construction of an unlimited number of barns and sheds for agricultural or recreational use on any portion of the property (not just the two-acre building sites), and commercial timber harvesting pursuant to an approved timber management plan. CVLT has the right to determine whether such uses would result in degradation to the conservation values.

Although the conservation deeds reserve the above rights for petitioners, they also permit CVLT to periodically enter and inspect the property to ensure

compliance with the terms of the conservation deeds. In the event that CVLT determines that the conservation values have been damaged, it is entitled to require that the owner restore the property. The condition of the Muscogee County properties at the time of the contributions are documented in the environmental reports, as contemplated by section 1.170A-14(g)(5)(i), Income Tax Regs.

The parties disagree about whether the conservation deeds restrict the location of the building sites. Petitioners contend that the conservation deeds incorporate by reference the "Baseline Documents", which they contend include the environmental reports and a map stipulating the placement of the building sites in locations that are consistent with the preservation of the conservation purposes. Petitioners contend that the map was developed in consultation with Ms. Mote and Ms. Bouthillier so as not to disturb the conservation purposes. Respondent contends that the "Baseline Documents" cannot legally be incorporated by reference and are not effective unless separately recorded.

We agree with petitioners. Respondent cites <u>Herman v. Commissioner</u>, T.C. Memo. 2009-205, in which we held that unrecorded documents were not binding. However, the conclusion in <u>Herman</u> was based upon New York State law. The relevant State law in the instant case is that of Georgia, and the Georgia Supreme

Court has held: "Where a deed or grant refers to a plat as furnishing the description of the land conveyed, the plat itself and the words and marks on it are as much a part of the grant or deed, and control so far as limits are concerned, as if such descriptive features were written out on the face of the deed or grant itself." State v. Ga. Ry. & Power Co., 80 S.E. 657, 659 (Ga. 1913); see also Spencer v. Poole, 60 S.E.2d 371, 372 (Ga. 1950). In that case, the Georgia Supreme Court did not make a distinction between recorded and unrecorded plats.[5] At least one Georgia court of appeals has specifically held that an unrecorded plat will be treated as incorporated by reference in a deed. See Chi. Title Ins. Co. v. Investguard, Ltd., 449 S.E.2d 681 (Ga. Ct. App. 1994). Accordingly, as a matter of law, reference in the recorded conservation deed to the map showing the location of the lots effectively made that map part of the recorded deed.

Additionally, by Georgia statute, subsequent purchasers are deemed to have knowledge of any commitment if notice is "sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led." Ga Stat. Ann. sec. 23-1-17 (LexisNexis 1982); see also Dejoo v. Suntrust Mortgage, Inc., 668 S.E.2d 245 (Ga. 2008); Lesser v.

---

[5]Black's Law Dictionary 1189 (8th Ed. 2004) defines a plat as a "map describing a piece of land and its features, such as boundaries, lots, roads, and easements."

Doughtie, 686 S.E.2d 416 (Ga. Ct. App. 2009).  Purchasers who have notice of a

commitment are subject to that commitment.  Ga. Stat. Ann. sec. 23-1-16

(LexisNexis 1982).  Consequently, we conclude that the restrictions on the location

of the lots in the conservation deeds and the map referenced therein are binding

under Georgia State law.

C.     Do the Conservation Deeds Preserve the Conservation
       Purposes in Perpetuity?

Despite the voluminous record in this case, which includes multiple expert

reports and trial testimony from both of the environmental consultants, there is a

paucity of evidence addressing the central issue of whether the reserved rights are

consistent with the conservation purpose.  Petitioners directed their evidence

almost exclusively at the issue of whether the properties presently fulfill the

conservation purpose.  Petitioners established that the properties, as they existed at

the time of the contributions, provided a significant "relatively natural habitat of

fish, wildlife, or plants, or similar ecosystem", within the meaning of section

170(h)(4)(A)(ii).  Testimony from the environmental consultants at trial and in

their reports established that the properties contained high-quality examples of

several different ecosystems, as well as habitat where rare, endangered,

orthreatened species normally live.  For instance, the supplemental environmental

reports describe high-quality examples of granite outcrops, oak-hickory-pine forest, and rocky shoals ecosystems. Although the environmental consultants identified only one threatened species living on the Muscogee County properties, we are persuaded that the properties include habitats where some rare, endangered, or threatened species normally live.

However, we must decide whether the conservation deeds actually preserve the conservation purpose in perpetuity, as required by the Code and the regulations. Sometimes, when landowners preserve their properties using conservation easements, those conservation easements permit no development at all, guaranteeing that the land will continue to exist in its then-current state. In such cases, evidence documenting a contemporaneous conservation purpose served by the land may be sufficient to show that the conservation easements serve the conservation purpose. However, in the instant case, petitioners have reserved rights enabling them to develop portions of their properties and conduct other activities that would noticeably alter the properties' current conditions. Accordingly, we must decide whether, if the properties were developed to the extent permitted by the rights reserved under the conservation deeds, they would still serve the conservation purpose.

The environmental reports prepared by Ms. Mote and Ms. Bouthillier state that their purpose was to describe the property as it existed before the donation of the conservation easements, and the reports do not mention the conservation deeds or give any indication that the environmental consultants reviewed the deeds before preparing their reports. At trial, the only testimony petitioners offered regarding whether the retained rights were consistent with the conservation purpose was a few exchanges between their counsel and the environmental consultants concerning the two-acre building sites. Regarding those sites on the James Butler property, Ms. Bouthillier testified as follows:

> Q. And from a conservation perspective what do you perceive insofar as the significance of the reserved rights as to, say, homes for Mr. Butler's children and grandchildren?
>
> A. You know, I think [the] setting of the property really hits home when you drive out to that site. And if you look there is such a variety of topography out there -- there's rolling hills, there's flat bottoms, there's water. And so there's this atmosphere of rural nature even though you're ten minutes from town. And it naturally sets itself up for places to enjoy that property. And we worked with a land planner and with environmental constraints and looking at the property to come up with some areas that might be suitable for house sites in the future for his descendants.

Other than the above testimony about the building sites, Ms. Bouthillier did not specifically testify about petitioners' retained rights. However, she stated that 400

acres were being preserved for wildlife and that for "400 acres to be preserved and guided by conservation principles is really priceless".

Regarding the retained rights on the Susan Butler property, Ms. Mote testified as follows:

Q. From a conservation easement --

A. Right.

Q. -- perspective and a wildlife perspective with the 12 acres, ten of which are perpetually reserved, how does that serve conservation of relatively natural habitat for wildlife?

A. Well, I believe in the baseline they have a site set up for that two-acre, which is actually located on a -- it looks like it could be an old homestead area with a livestock corral like within the center of the property. It's back off of Hubbard Road. I'm not sure if you can -- I don't even think you can see it from Hubbard Road. And so it's relatively in the center of the site from what I recall.

Q. And so -- all right. Would your conclusion be the same as your earlier comments about relatively natural habitat for wildlife in light of that two-lot reservation -- that two-acre reservation?

A. Uh-huh.

Q. I'm sorry?

A. Yes. Yes.

*       *       *       *       *       *       *

Q. And in doing that analysis was it necessary for you to determine what would be in the conservation easement and what would be excluded -- or retained out of the conservation easement?

A. It was. The -- where we wanted to do -- because you can't just go in and put, you know, a large high-rise or several homes on a -- in a wetland. So we have to go out first and find out what areas are there, what areas are suitable, whether it's soil -- you know, sometimes there's soil that's not -- that's proper enough to be able to build upon. So we look for where the soils are, where the wetlands are, where the flood plains are. And then we go in to look to see where you could have home sites.

The foregoing testimony was directed only at the issue of whether the reserved rights to build on the home sites are consistent with the conservation purpose. Petitioners offered no testimony that the other reserved rights are consistent with the conservation purpose.

In support of their contention that the other reserved rights are consistent with the conservation purpose, petitioners point to CVLT's enforcement rights under the conservation deeds. Petitioners contend that if they or some future owners were to use the land in a manner inconsistent with the conservation purposes stated in the conservation deeds, CVLT would have the right to enforce the conservation deeds and require the owner to restore the land.

Respondent contends that the reserved rights are inconsistent with the conservation purpose, but respondent offered no expert witness testimony to support his contention. Instead, respondent contends that the conservation deeds

fail to address how the reserved rights can be exercised so as not to thwart the conservation purpose. Respondent argues that the reserved rights could be exercised in ways that would destroy the habitats and high-quality ecosystems on the property. However, respondent did not introduce any evidence in support of that argument or any evidence that CVLT would be likely to fail to enforce its rights granted under the conservation deeds or that CVLT would otherwise permit petitioners or their successors to use the land in a manner inconsistent with the conservation purpose.

Although the record on the issue of whether the conservation deeds preserve the conservation purpose in perpetuity is sparse, we conclude that petitioners have presented credible evidence--in the form of the expert testimony noted above, the overarching rights granted to CVLT in the conservation deeds themselves, and the annual monitoring conducted by CVLT--that the conservation deeds preserve the conservation purpose, and the burden of proof therefore shifts to respondent. As noted above, respondent offered no contrary expert witness testimony and pointed to no evidence that would suggest that CVLT is likely to abandon its right to enforce the conservation deeds. Consequently, we conclude that respondent has failed to establish that the conservation deeds do not protect significant habitat.

Accordingly, we hold that the conservation deeds satisfy the requirements of section 170(h)(4)(A)(ii) and section 1.170A-14(d)(3), Income Tax Regs.

Issue 2. The Proper Values of the Conservation Contributions With Respect to the Muscogee County Properties

## Discussion

Generally, the amount of a charitable contribution is the fair market value of the contributed property at the time it is contributed. Sec. 1.170A-1(a), (c)(1), Income Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

In deciding the fair market value of property, we must take into account not only the current use of the property but also its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934); Hilborn v. Commissioner, 85 T.C. 677, 689 (1985). If different from

the current use, a proposed highest and best use requires "closeness in time" and "reasonable probability". Hilborn v. Commissioner, 85 T.C. at 689.

Where a substantial record of comparable easement sales exists, the fair market value of the donated easement is based on the sale prices of those comparable easements. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Where, as in the instant case, there is no established market for similar conservation easements and no record exists of sales of such easements, the regulations provide another method to determine fair market value:

> If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

Id. We have often applied the "before and after" approach to determine the fair market values of conservation easements. See, e.g., Hilborn v. Commissioner, 85 T.C. 677 (1985); Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011); Kiva Dunes Conservation, L.L.C. v. Commissioner, T.C. Memo. 2009-145; Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990).

An appraiser may use the comparable sales method, or another accepted method, to estimate the before and after values of the property. Hilborn v. Commissioner, 85 T.C. at 689. An appraiser using the comparable sales method, also known as the market-data approach or sales comparison approach, finds sales of properties that meet three criteria: (1) the properties themselves are similar to the subject property; (2) the sales are arm's-length transactions; and (3) the sales have occurred within a reasonable time of the valuation date. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). Because no two sales and no two properties are ever identical, the appraiser then considers aspects of the comparable transactions such as time, size, or other significant features and makes appropriate adjustments for each to approximate the qualities of the subject property. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19. We have found the comparable sales approach to be the most reliable indicator of value when there is sufficient data about sales of properties similar to the subject property. See, e.g., Estate of Spruill v. Commissioner, 88 T.C. at 1229 n.24; Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, aff'd without published opinion, 566 F.2d 1183 (9th Cir. 1977).

Another valuation method sometimes employed is the income or discounted cashflow approach. See Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283; Losch v. Commissioner, T.C. Memo. 1988-230. The income approach to valuing real property involves discounting to present value the expected cashflows from the property. See, e.g., Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283; Losch v. Commissioner, T.C. Memo. 1988-230. The theory behind the approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income.

Additionally, when using the before and after valuation approach, any enhancement in the value of a donor's other property resulting from the easement contribution, or of property owned by certain related persons, reduces the value of the contribution deduction. Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

Petitioners retained three appraisers who wrote reports with respect to the Muscogee County properties: David Roberts, Gregory Eidson, and Rudolph Quillian. Mr. Roberts' reports were completed at the time of the contributions and submitted by petitioners with their 2003 tax return. The other reports were retrospective valuations prepared in anticipation of the instant litigation. To value the Muscogee County properties in their before conditions, all of petitioners' appraisers used the sales comparison approach and the discounted cashflow

analysis, also variously called the income capitalization approach or the subdivision analysis. However, in their reply brief, petitioners abandoned their reliance on the discounted cashflow valuations. For that reason, we will not consider petitioners' discounted cashflow analyses. Respondent submitted one appraisal report with respect to each of the Muscogee County properties. Those reports were written by Zac Ryan.

The appraisal reports do not agree on the precise acreage of the James Butler property. In their stipulations, the parties agreed to use 393.33 acres as the acreage of the James Butler property. Accordingly, in the findings and analysis below, we have adjusted the appraisers' numbers to reflect the parties' stipulation, unless otherwise noted.

An expert's opinion is admissible if it assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. We evaluate expert opinions in light of each expert's qualifications and the evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by an expert's opinion and may accept or reject an expert opinion in full or

in part in the exercise of sound judgment.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562.  We may also reach a decision as to value based on our own examination of the evidence in the record.  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

A.      The James Butler Property

1.      The Appraisal Reports

a.      Mr. Roberts' Appraisal Report

Mr. Roberts is a real estate appraiser with the firm Tennille & Associates, Inc., based in Boone, North Carolina.  He holds the SRA (Senior Residential Appraiser) designation with the Appraisal Institute.[6]  He has been a real estate

---

[6]The SRA designation was formerly the certification given by the Society of Real Estate Appraisers (society) to residential appraisers.  Appraisers Coalition v. Appraisal Inst., 845 F. Supp. 592, 595 (N.D. Ill. 1994).  The highest certification of the society was the SRPA (Senior Real Property Appraiser).  Id.  That designation was comparable to the MAI (Member Appraisal Institute) designation given by the American Institute of Real Estate Appraisers (AIREA).  Id.  The AIREA also used the designation RM, which was comparable to the society's SRA.  Id. at 595-596.  During 1991, the society merged with the AIREA to form the Appraisal Institute.  Id. at 596.  The Appraisal Institute kept the MAI designation as its highest certification and kept the SRA designation as its certification for residential appraisers.  Id.  Within the real estate appraisal community, MAI is viewed as the highest regarded appraisal designation.  See Schwartz v. Commissioner, T.C. Memo. 2008-117, aff'd, 348 Fed. Appx. 806 (3d Cir. 2009); Estate of Auker v. Commissioner, T.C. Memo. 1998-185.

appraiser for 26 years, and he has been appraising conservation easements since 1998. Mr. Roberts received assistance in preparing his report from Pattie J. Tennille, but she did not testify at trial.

During 2009, the North Carolina Appraisal Board suspended Mr. Roberts' license because of errors he committed in an appraisal report completed during 2006. In that report, he had erroneously concluded that the highest and best use of the vacant land he was appraising was retail office space or multifamily residential use. Such use was not permitted under the zoning laws applicable to that property. To regain his appraiser's license, Mr. Roberts had to complete five classes, including a class on the valuation of vacant land and subdivision valuation. Before completing those courses, Mr. Roberts had no formal training on valuing vacant land or subdivisions.

Regarding the James Butler property, Mr. Roberts concluded that its highest and best use was as a 222-lot subdivision. He relied on a subdivision plan developed by Larry French (the French plan), a Columbus-area subdivision planner. Mr. Roberts wrote in his report that the lots in that plan ranged from one to four acres. He stated that those lots were compatible with the property's zoning, which was A-1 agricultural. However, on cross-examination, Mr. Roberts

admitted that the French plan actually shows lot sizes as small as half an acre.   Mr. Roberts did not independently verify the feasibility of the French plan.

Mr. Roberts used two approaches to value the property:  the sales comparison approach and the discounted cashflow approach.  Using the sales comparison approach, Mr. Roberts found four comparable sales and adjusted the value of those sales for time, location, size, and usability.  He then used those comparable sales to estimate that the before value of the James Butler property was $10,000 per acre, or $3,933,300.

When Mr. Roberts wrote his appraisal report, he was unaware of the offers that Mr. White and Mr. Brown had made on the James Butler property.  When he was asked by petitioners' counsel what effect the knowledge of those offers would have had on his estimate of the value of petitioners' properties, Mr. Roberts testified as follows:

> Q. Had you known about * * * [the offers], what would have been the impact on your conclusion?
>
> A. Well, I would have considered the offers.  I would back them up and try to, obviously, still use closed sales, but I would have reported it in the history of the property if I had known it.
>
> Q. All right.  Could it have affected your ultimate conclusion?
>
> A. It would have been a consideration.

Mr. Roberts also was unaware that a 164-acre tract just south of the Susan Butler property sold for $22,477 per acre during February 2004. He testified that had he been aware of that pending transaction during 2003 when he was completing his appraisal report, it would have increased his estimate of the value of petitioners' properties. However, he did not indicate by how much his estimate would have increased.

With respect to the highest and best use of the James Butler property after petitioners had granted the conservation easement, Mr. Roberts wrote in his report the following:

> The easement area * * * is vacant land encumbered by a conservation easement. No improvements are allowed and no analysis as improved is required. * * *
>
>     *        *        *        *        *        *        *
>
> The highest and best use of the subject property, considering the conservation easement granted on a 396.5 acre portion of the land tract, would be for open meadows, hiking trails, hunting area, horseback riding areas or recreation area on this section of the property. The 11 homesites excluded from the easement area would allow for single family structures to be built within the boundaries of this section of the property.

Mr. Roberts separately valued the 11 two-acre homesites and the remainder of the 393.33 acres, i.e., 371.33 acres.[7] To value the 371.33-acre portion, Mr. Roberts

---

[7]Mr. Roberts erroneously used 396.5 acres as the size of the undeveloped

(continued...)

used the sales comparison approach. He used the sales of five large, mostly vacant lots as comparable sales. Only one of the properties in Mr. Roberts' comparable sales, a 46.8-acre tract in North Carolina, was burdened with a conservation easement. To adjust for the fact that the other comparable properties were not encumbered by conservation easements, Mr. Roberts made "usability" adjustments ranging from zero to minus 50%. His adjustments were based upon his estimate, using factors he did not explain, of how much the conservation easements would have detracted from the value of those comparable properties. After making other adjustments to each comparable sale for time, location, size, and access, he averaged the comparable sales and determined that the price of the 371.33-acre portion of the James Butler property was $4,000 per acre, for a total of $1,485,200.

Mr. Roberts then used a discounted cashflow analysis to value the 11 remaining two-acre lots, which he estimated to be worth $77,000 each. After estimating an absorbtion rate and expenses, Mr. Roberts discounted the lot sales to arrive at $213,000. In total, Mr. Roberts estimated that the value of the James Butler property in the after condition was $1,698,200. He also estimated that the

[7](...continued) portion because he neglected to subtract the unencumbered 24.5 acres of the Butler estate. As noted above, the parties agreed in their stipulations that the correct acreage was 393.33 acres. Accordingly, the correct acreage, after removing the 11 two-acre homesites, is 371.33 acres.

conservation easement enhanced the value of the unencumbered Butler estate by $37,000.

### b. Mr. Eidson's Appraisal Report

Mr. Eidson is a self-employed commercial real estate appraiser based in Auburn, Alabama. Mr. Eidson has a bachelor's degree and holds the MAI (Member of Appraisal Institute) designation from the Appraisal Institute. He has more than 20 years of experience in the valuation industry, but he had never appraised a conservation easement before his work for petitioners.

Mr. Eidson concluded that the highest and best use of the property in the before condition was for residential development. Mr. Eidson used both the sales comparison approach and the discounted cashflow approach. For his sales comparison approach, he found four comparable sales, made various adjustments, and estimated that the James Butler property was worth $19,500 per acre, or approximately $7,670,000.

Mr. Eidson's appraisal report is silent regarding the highest and best use of the property in its after condition. Mr. Eidson used the sales comparison approach to separately value the encumbered 371.33 acres of the James Butler property, the 11 remaining two-acre lots, and the Butler estate.

To value the encumbered portion, Mr. Eidson applied a two-step approach. First, Mr. Eidson used three sales of recreational land from nearby in Muscogee County to estimate the value of the property as recreational land. All of those properties were inferior to the James Butler property and were not suited for development. After making small adjustments for time and topography, Mr. Eidson averaged those values and concluded that the value of the encumbered property as recreational land was $6,300 per acre.

For his second step, to estimate the effect of the conservation easement on the James Butler property, Mr. Eidson examined seven sales of properties that were encumbered by conservation easements. Appraisals of those properties completed by other appraisers show that the conservation easements decreased the sale prices of the encumbered properties by 40% to 84%. Mr. Eidson did not report the terms of any of those easements, nor did he attempt to explain why some of the easements decreased the value of the properties they encumbered by twice as much as other easements. Instead, he used the average of those percentages to estimate that the conservation easement would decrease the value of the encumbered portion of the James Butler property by 60%. However, rather than apply the 60% diminution to his before value, he applied it to the value he estimated on the basis of sales of inferior recreational land. He therefore

calculated that the encumbered 371.33 acres were worth $2,520 per acre, or approximately $935,700.

With respect to the 11 remaining two-acre lots, Mr. Eidson searched for comparable sales of two-acre lots surrounded by conservation easements, but he was unable to find any such sales. Instead, he estimated that the lots would sell for approximately the same price as lots in nearby subdivisions: $70,000 each. Although the lots would lack the amenities of the subdivision, they would have more privacy and a rural setting. He therefore estimated that the value of the James Butler property after being encumbered by the conservation easement was $1,705,700.

Mr. Eidson concluded that the conservation easement did not enhance the value of the Butler estate.

### c. Mr. Quillian's Appraisal Report

Mr. Quillian is a real estate appraiser based in LaGrange, Georgia. He is employed by General Valuation Services, L.L.C. Mr. Quillian holds a bachelor's degree and a master's degree in business administration, and he holds the MAI designation from the Appraisal Institute. He has 35 years of experience appraising real estate, but he had never valued a conservation easement before his work in the

instant case. To learn how to appraise conservation easements, he took a course on the subject from the Appraisal Institute.

Mr. Quillian found that the highest and best use of the James Butler property in the before condition was for residential development as a subdivision. In one place in his report, Mr. Quillian concluded that the James Butler property could be developed to a density of up to two houses per acre; however, in another place, he wrote that the zoning did not permit development denser than one house per acre. Unlike the other appraisers, Mr. Quillian used a hybrid approach to value the property. He estimated the value of the southernmost 125 acres of the James Butler property using a discounted cashflow analysis, and he estimated the value of the remainder using a sales comparison approach. Mr. Quillian believed that the southernmost 125 acres were ready for immediate development but that developers would not be as interested in the portion of the property north of Pritchett Road because its topography was not as well suited to development. However, he believed that, as developable land in the Columbus area became scarcer, a developer would eventually want to purchase the northern portion.

In calculating the value of the northern portion, Mr. Quillian found seven comparable sales. All of the comparable sales were of properties smaller than the James Butler property, ranging in size from 30.5 acres up to 163.8 acres. Despite

the fact that he identified the northern portion as not yet ready for development, the comparable sales he used were all purchases by developers who intended to use the properties to construct subdivisions or, in one case, apartment buildings. Mr. Quillian did not make any specific adjustments to his comparable sales. He concluded that two of his seven comparable sales were the most similar to the northern portion of the James Butler property, which he estimated to be worth $18,000 per acre. That value was somewhere in between the values of the properties in those two comparable sales. Mr. Quillian did not offer any other explanation for his belief that $18,000 per acre was an appropriate value.

With respect to the southernmost 125 acres, Mr. Quillian calculated, using the discounted cashflow method, that the value of the property was $3,206,871, or $25,655 per acre. During cross-examination, Mr. Quillian admitted that he had made an error in his discounted cashflow calculation when he wrote that 50 lots could be developed without building any new roads on the property. Indeed, only 19 lots could have been developed without the construction of a new road. During redirect testimony on the following day, Mr. Quillian testified that he had reviewed his calculations overnight and found that, although he had written 50, he had actually used only 20 in his calculation. However, in his new calculations, he changed the number of lots that had access to sewer lines from 41 to 59.

Nevertheless, he concluded that development costs would be the same under both plans. His new calculations also accelerated the subdivision development schedule so that lots with sewers would to be sold six months earlier than under his original schedule. When questioned about his calculations during cross-examination, Mr. Quillian's responses were unclear, and he was unwilling or unable to explain or clarify some of the assumptions and math behind the numbers he produced.

In constructing his discounted cashflow analysis, Mr. Quillian used lot sales from 2005 because the data he was using did not extend back to 2003. In Georgia, as in the rest of the United States, the housing market had appreciated rapidly during the period from 2003 to 2005 and was very inflated during 2005.

Mr. Quillian's report had a number of problems. Although he stated that the northern portion was not yet desirable to developers and would not have sold for development, he estimated its value using sales of properties that were ready for development. Additionally, all of the comparable sales he used were smaller than the James Butler property, but he did not make any adjustment for size. When he constructed his discounted cashflow analysis, he erred in his decision to base his estimate for lot prices on prices from 2005 instead of 2003, despite the fact that lot prices during 2005 were significantly higher than during 2003. He made several

other errors in constructing his discounted cashflow analysis and was unable to satisfactorily correct for those errors. Additionally, Mr. Quillian failed to identify the correct highest and best use for the property in its after condition: He did not recognize that the encumbered 371.33 acres could be broken up and bundled with the building sites and did not indicate awareness of certain retained rights such as the ability to landscape the properties and engage in significant recreational activities. Those oversights led him to conclude erroneously that it would be impossible to sell the retained lots as estate-style residences similar to the Butler estate and that there would be no market for those lots.

As noted above, petitioners have now abandoned their reliance on the discounted cashflow valuations. Because Mr. Quillian did not use another method to value the southernmost 125 acres, petitioners' decision to abandon that method renders Mr. Quillian's conclusions regarding the value of the conservation easement on the James Butler property largely useless.

### d. Mr. Ryan's Appraisal Report

Mr. Ryan, respondent's sole appraiser in the instant case, is a self-employed real estate appraiser based in Middleburg, Florida. He has been certified to appraise properties in Florida, Georgia, and South Carolina, and he holds the MAI designation from the Appraisal Institute. Mr. Ryan has more than 25 years of

experience appraising real estate, and he has been appraising conservation easements since 1994, completing more than 100 conservation easement appraisals. His clients have included the Nature Conservancy, the Georgia Land Trust, the Georgia Department of Natural Resources, and the Florida Department of Environmental Protection. Although Mr. Ryan has completed appraisals in 20 Georgia counties, before his engagement in the instant case, he had never appraised a property in Muscogee County.

Mr. Ryan concluded that the highest and best use of the James Butler property in the before condition was for residential development. He used the sales comparison approach to estimate the property's value. Unlike petitioners' appraisers, Mr. Ryan relied only on the sales comparison approach and did not consider the discounted cashflow method because he concluded that there were sufficient comparable land sales. After finding four comparable sales and making various adjustments, Mr. Ryan concluded that the before value of the James Butler property was $12,000 per acre, or approximately $4,720,000.

Before determining the highest and best use of the property in the after condition, Mr. Ryan devoted six pages of his report to an analysis of the rights encumbered by the terms of the conservation deed. He discussed 11 different factors: title, transferability, division of the property, residential development,

industrial or commercial use, agricultural use, silvicultural use, mining, hunting and fishing rights, access to the property, and permissible roads and other structures. For each factor, he discussed the rights permitted under the terms of the conservation deed and whether those terms affected the value of the subject property.

Mr. Ryan concluded that the highest and best use of the property in the after condition was for 11 rural estates, each combining agricultural or undeveloped land with a two-acre building site. To estimate the value of the James Butler property in the after condition, Mr. Ryan used several approaches. Firstly, he compared the property in its after condition to all four of his comparable sales and concluded that its value was inferior to all of them. Accordingly, he concluded that the after value was at most $9,525 per acre, the adjusted value of the most inferior comparable sale used by Mr. Ryan.

Secondly, Mr. Ryan considered three similar sales of property out of a single tract of land. The price of one of those sales was 26% less than the other two because that portion of the property was encumbered by a mining lease until 2015. Mr. Ryan estimated that the permanent conservation easement on the James Butler property would decrease its value by at least as much as the temporary mining lease.

Thirdly, Mr. Ryan compared the terms of the conservation easement on the James Butler property to the terms of two other conservation easements he had appraised, both of which were on large tracts of rural property in Florida. For each of those conservation easements, he described in detail 11 different ways that the easement affected the value of the encumbered property. Both of the other conservation easements were significantly more restrictive than the conservation deed with respect to the James Butler property. However, because one of the properties offered significantly less development potential than the James Butler property, Mr. Ryan concluded that the diminution in value associated with the conservation deed on the James Butler property was somewhere between the percentage diminutions in value observed on those properties, i.e., between 34% and 65%. On that basis, he estimated that the conservation easement reduced the value of the James Butler property by 50% to about $6,000 per acre. Mr. Ryan did not separately value the lots retained for building sites. He concluded that the value of the James Butler property after encumbrance by the conservation easement was approximately $2,360,000.

Mr. Ryan conducted a fourth analysis to check the reasonableness of his conclusion. On the basis of his conclusion that the highest and best use of the property in its after condition was for large estate-style residences, he considered

several sales of estate-style parcels from two developments in Muscogee County and two in neighboring Harris County. The 20 estate parcels Mr. Ryan considered ranged in size from 5 acres up to 18 acres and in price from $38,500 up to $180,000. The more expensive estate-style parcels generally were either lakefront properties or the larger parcels. Because the potential estate-style lots on the James Butler property would average about 36 acres, at least twice as large as any of the other sales Mr. Ryan compared, he concluded that 11 large estates with two-acre building sites and the option to engage in small-scale farming or recreational use of the remainder of the property would fetch at least $208,000 each. He therefore concluded that the sale of nearby estate-style lots corroborated his conclusion about the after value of the James Butler property.

e.     Summary

In summary, the appraisers estimated the following before and after values for the James Butler property:

|  | Roberts | Eidson | Quillian | Ryan |
|---|---|---|---|---|
| Before | $3,993,300 | $7,670,000 | N/A | $4,720,000 |
| After | 1,698,200 | 1,705,700 | N/A | 2,360,000 |
| Enhancement | 37,000 | -0- | N/A | -0- |
| Easement value | 2,258,100 | 5,964,300 | N/A | 2,360,000 |

2.      Disputed Issues

Before analyzing the appraisers' reports and conclusions, we must decide a few other disputed issues.[8]

a.      Zoning

At the time of the contribution, the Muscogee County properties were zoned A-1, which prohibited development denser than one house per acre. The appraisers disagreed about the ease with which the properties could have been rezoned to permit denser development. However, the developer Mr. White credibly testified that, when he offered to buy a portion of the James Butler property during 2003, he expected that it would be easy to change the zoning to permit development of a subdivision with a density of more than one house per acre. He explained that undeveloped property is frequently zoned A-1 before development. Mr. Eidson explained that because property taxes are lower on property zoned A-1, most landowners choose not to seek rezoning for their property until it is developed. The record contains several examples of properties that were rezoned from A-1 to permit denser residential development. Although the offers made by Mr. White and Mr. Brown were contingent upon obtaining

---

[8]For the reasons explained below, we decide these issues on the preponderance of the evidence.

rezoning, the fact that they made such offers suggests they believed rezoning would have been pro forma. On the basis of the foregoing, we conclude that rezoning would have been possible and that developers would have been interested in the property in spite of its then-current A-1 zoning.

### b. Covenants Regarding Lot Size

Approximately 27% of the James Butler property is subject to covenants running with the land that mandate minimum lot and house sizes.[9] The 41.64 acres just south of Pritchett Road is subject to the following restrictions: no house may be built that has less than 2,000 square feet of heated living space and no lot may be sold that is less than 2 acres. The 90 acres just north of Pritchett Road, including the Butler estate, is subject to the following restrictions: no house may be built that has less than 2,500 square feet of heated living space and no lot may be sold that is less than 4 acres. Not including the Butler estate, the 4-acre provision applies to 65.58 acres. All of the properties with lot size restrictions were acquired from the Pritchett brothers.

Petitioners contend that when Mr. Butler acquired title to both tracts, the doctrine of merger extinguished the covenants running with the land. Under

---

[9]The covenants apply to 131.72 acres, but the Butler estate accounts for 24.5 of those acres. The covenants therefore apply to only 107.22 acres of the 393.33 acres of the James Butler property (27%).

Georgia law, when some lots are burdened with covenants intended to benefit other lots and all lots come under the same ownership, the covenants burdening the lots generally are extinguished.  See Muscogee Mfg. Co. v. Eagle & Phenix Mills, 54 S.E. 1028, 1031 (Ga. 1906).  Petitioners attempted to prove that merger had occurred through Mr. Butler's testimony regarding his purchases of property from the Pritchetts and his knowledge of his neighbors.[10]  However, Mr. Butler testified that, in addition to the lots they sold to him, the Pritchetts sold an adjacent lot to Dwain Tobey (Tobey lot).  Because the Tobey lot has not come under common ownership, petitioners have failed to prove that the conditions necessary for merger have been met.  Accordingly, we conclude that the land remains burdened by the covenants requiring minimum lot sizes.

---

[10]At various points during trial and in their briefs, petitioners suggested that they were surprised when respondent raised the issue of the lot size restrictions at trial and that respondent did not produce the evidence of the covenants in compliance with the Court's Standing Pretrial Order, which requires the parties to exchange exhibits 14 days before trial.  Petitioners contend that they therefore were unprepared to present evidence proving merger.  We disagree.  The deeds containing the covenants were included among the stipulated exhibits, and they were also in Mr. Roberts' original appraisal report, even though he failed to notice the restrictions.  Moreover, the covenants are discussed in Mr. Ryan's report and in respondent's pretrial memorandum.  Regardless, because the evidence in the record shows that no merger occurred, we conclude that petitioners were not disadvantaged.

Petitioners' appraisers failed to notice the covenants restricting lot size and therefore did not consider them when appraising the James Butler property. Indeed, the subdivision plan used by petitioners' appraisers showed lot sizes smaller than those permitted under the covenants. Mr. Ryan was the only appraiser who considered the effect of the covenants in his appraisal report. He concluded that those restrictions decreased the value of the property, but he did not provide a specific numeric estimate of that impact.

Petitioners contend that the covenants restricting lot sizes would not have affected the value of the property because four-acre "estate lots" sell at a higher price per acre than smaller lots. However, the evidence in the record does not support their contention. Only Mr. Quillian testified that four-acre lots would sell for a higher price per acre than smaller lots, but he contradicted his own testimony during cross-examination. Mr. Quillian's testimony regarding the price per acre of different lot sizes lacked credibility, and we give it no weight. All of the other appraisers agreed that, other things being equal, larger lots generally sell for less on a per-acre basis than smaller lots.[11]

_____

[11]Even if it were true that such "estate lots" sold for a premium, a restriction on the tract that limited the freedom of developers to choose the size of lots or houses would presumably have reduced the appeal of the tract and lowered its price. Moreover, developers would have been free to sell four-acre lots even in

(continued...)

Accordingly, we conclude that the lot size restrictions covering 27% of the James Butler property would have decreased its value by some amount, and we will consider that diminution in value in our analysis below. Because petitioners' appraisers did not take into account that diminution in value, their conclusions overstated the property's value.

### c. The Unaccepted Offers

The parties disagree about how much weight the appraisers should have given the unaccepted offers made on the southernmost portion of the James Butler property. One of the unaccepted offers was made on the southernmost 75 acres; the other two offers were made on only 42 acres of that same portion. Those offers represent 19% and 11% of the entire 393.33 acres. Petitioners contend that those offers are indicative of the value of the entire property. We do not agree and conclude that petitioners' contention is inconsistent with the evidence.

During cross-examination, Mr. Eidson admitted that although in his report he had called the topography of the James Butler property "basically level", it would be more accurate to call the northern portion "rolling". Indeed, petitioners'

---

[11](...continued)
the absence of the covenants. The fact that the subdivision plan used by the appraisers contains very few such lots strongly suggests that there was no such premium.

environmental consultants characterized the northern portion of the property as steeper than rolling.  Not only is the northern portion much hillier than the southern portion, it is also much rockier.  Petitioners' environmental consultants stated that there is "significant rock" in the northern portion, including many rocky outcrops along the creeks.  In contrast, the southernmost portion is less rocky, and the banks of the creeks are sandy.  In addition to the exposed rock, the northern portion appears to contain significant rock beneath the surface.  There are several major rock quarries just a mile east of the James Butler property, and one of petitioners' witnesses familiar with the area testified that "you can rest assured there's rock under" the property.  Mr. White testified that land with rocky soil is undesirable because excavation is very expensive and that developers therefore "stay away" from such properties.  In contrast, Mr. White was willing to offer a premium for the southernmost portion of the James Butler property because its topography was better than that of the neighboring land.  When Mr. White identified all the properties in Muscogee County that he considered ready for development, he did not include any portion of the James Butler property except for the southernmost 75 acres.

Mr. White also testified that he was willing to pay a "tremendous premium" on the James Butler property because of its access to sewer lines.  However, only

the southernmost portion had access to sewer lines, which ran along southeastern

corner of the property bordering Hubbard Road.

Mr. Ryan and Mr. Roberts were unaware of the unaccepted offers and

therefore did not consider them when they conducted their appraisals. Both of them

acknowledged that had they been aware of the offers, they would have considered

them. Mr. Ryan testified that after he became aware of the offers, he reconsidered

his valuation but concluded that those offers were still consistent with his appraisal

value because he had already given a much higher value to the southernmost portion

of the property. Even Mr. Roberts, petitioners' appraiser, was reluctant to say that

the unaccepted offers would have increased his appraisal estimate.[12]

Because Mr. White and Mr. Brown made offers to purchase only 11% of the

393.33 acres and because the evidence shows that that portion of the property was

significantly more desirable than the remainder, those offers are not meaningful

---

[12]Mr. Roberts initially testified that he would have "considered" those offers but that he would still have used closed sales. He later agreed that knowledge of the offers would have increased his value. However, the latter statement was in response to a series of leading questions by petitioners' counsel to which we sustained respondent's objection. Mr. Roberts initially seemed reluctant to say that the offers would have increased his appraisal, and we consider that testimony more credible than his subsequent acquiescence to leading questions from petitioners' counsel.

indicators of the value of the entire property. Accordingly, although the unaccepted offers are relevant evidence of the value of the portion of the James Butler property on which they were made, they are not very helpful in deciding the value of the entire property.

    3.    <u>Analysis and Conclusion</u>

As a preliminary matter, we note that Mr. Quillian's testimony regarding the value of the conservation easement on the James Butler property was generally unhelpful. On several occasions, he made inconsistent or contradictory statements, and his testimony was generally not useful to the Court. Accordingly, in the analysis below, we give little weight to his conclusions regarding the value of the conservation easement on the James Butler property.

    a.    <u>The Before Value</u>

The appraisers considered the following properties comparable to the James Butler property:

| ID[1] | Appraisers[2] | Date | Address | Sale price | Size (acres) | Price per acre | 2003 Price[3] |
|---|---|---|---|---|---|---|---|
| 1 | GE, RQ, ZR | 12/22/03 | Blackmon Rd. | $1,607,694 | 97.44 | $16,499 | $16,499 |
| 2 | DR, ZR | 6/18/98 | Garrett Rd. | 3,705,500 | 423.25 | 8,755 | 10,863 |
| 3 | GE, ZR | 12/00 | Veterans Pkwy. | 2,440,994 | 132.00 | 18,492 | 20,801 |
| 4 | GE, RQ | 2/19/04 | Bridgemill Dr. | 3,686,265 | 164.83 | 22,500 | 22,280 |
| 5 | ZR | 3/31/97 | Garrett Rd. | 2,182,268 | 282.73 | 7,718 | 10,057 |
| 6 | RQ | 2/1/99 | Hancock Rd. | 900,000 | 62.53 | 14,393 | 17,340 |
| 7 | DR | 8/16/99 | Macon & Pope Rd. | 2,500,000 | 461.00 | 5,423 | 6,407 |
| 8 | DR | 10/6/00 | Biggers Rd. | 414,000 | 39.50 | 10,481 | 11,790 |

| 9 | RQ | 3/1/02 | Blackmon Rd. | 960,000 | 32.00 | 30,000 | 32,131 |
| 10 | RQ | 12/1/02 | Warm Springs Rd. | 737,506 | 99.66 | 7,400 | 7,696 |
| 11 | GE | 1/03 | Williams Rd. | 1,175,500 | 34.00 | 34,574 | 35,957 |
| 12 | RQ | 12/1/03 | Osprey Cove | 575,000 | 30.50 | 18,852 | 18,852 |
| 13 | DR | 12/16/03 | Williams Rd. | 1,697,500 | 60.80 | 27,918 | 27,918 |
| 14 | RQ | 5/1/04 | McKee Rd. | 1,288,000 | 90.50 | 14,232 | 13,956 |

[1]The "ID" field contains numbers which we have assigned to each of the comparable sales for convenience.

[2]The entries in the "Appraisers" field are the first and last initials of each of the appraisers who used that comparable sale in his report:  GE = Gregory Eidson; RQ = Rudolph Quillian; DR = David Roberts; and ZR = Zac Ryan.

[3]Prices in this column have been adjusted to December 2003 prices using an estimated 4% annual appreciation (for the reasons explained below in the text), adjusted to the nearest quarter of a year from December 2003 (e.g., sale 2 has been adjusted to reflect 5.5 years of appreciation, sale 4 to reflect -0.25 years, etc.).

The appraisers used a total of 14 different sales, and 4 of those sales were used by more than one appraiser.

The appraisers applied different rates of appreciation to adjust those sales to December 2003 prices.  Mr. Ryan interviewed a number of local market participants who told him that appreciation ranged from 3% to 5% each year from 1997 through 2003.  He used 4% appreciation per year.  Mr. Roberts did not explain how he calculated appreciation, but his numbers show that he also used approximately 4% per year.  Mr. Eidson used only 2.57% per year, which he based on the consumer price index.  Mr. Eidson's method was inappropriate because property values in Muscogee County during the relevant period were rising faster

than the consumer price index. We will apply the 4% appreciation used by Mr. Ryan and Mr. Roberts.

Petitioners contend that it was unreasonable for Mr. Ryan to use sales from the eastern "panhandle" of Muscogee County because land in that area was not as valuable. They therefore contend that sales 2 and 5 are not truly comparable and that Mr. Ryan would have known not to use sales from the panhandle if he had been more familiar with Muscogee County. Mr. White testified that the prime area of development in Muscogee County during 2003 was north of Columbus from the Chattahoochee River to Pierce Chapel Road.[13] Although petitioners make much of the fact that Mr. Ryan was not from Muscogee County, neither were any of their appraisers. Mr. Roberts and Mr. Eidson were both from out of state, and Mr. Quillian was from two counties north of Muscogee County. Like Mr. Ryan, both Mr. Quillian and Mr. Roberts used several sales from the "panhandle" (sales 2, 7, 10, and 14) and did not make any adjustments to compensate for the supposedly

---

[13]Petitioners actually contend that Interstate 185 is the eastern border of the prime development area, but the only evidence in the record supporting that contention is Mr. Quillian's testimony, which we did not find credible for the reasons explained above in the text and infra note 14. Sale records show that Mr. White was willing to pay similar prices for land near Interstate 185 and for land near Pierce Chapel Road, corroborating his testimony. Pierce Chapel Road is about five miles east of Interstate 185.

inferior location of those sales.[14] Nevertheless, because we found Mr. White to be a credible witness and because he was most familiar with the demand for developable land in Muscogee County during 2003, we conclude that the land in the eastern portion of the county was somewhat less desirable than the land between the river and Pierce Chapel Road. Properties in the latter area generally have better access to downtown Columbus, making them more valuable.

However, the lower land prices observed in sales 2, 5, 7, and 10 cannot be explained entirely by their location. The property conveyed in sale 14, although more than twice as far from Pierce Chapel Road as any of the other properties, sold for $14,232 per acre, significantly more than any of the other properties in the panhandle. Respondent contends that the properties in sales 2, 5, and 7 sold for lower prices per acre because of their size. As the basis for his contention, respondent points to the testimony of nearly all the appraisers that, other things being equal, a property that is larger will sell for a lower price per acre. Mr. Ryan

---

[14]In his report, Mr. Quillian wrote: "All sales have a relatively similar location on the north side of Columbus * * *. Pairing * * * [sales 1 and 14], the sales [sic] further east seems to be less desirable, not because it is 'east' but because it is a greater distance from the JR Allen By-Pass". During his testimony, Mr. Quillian contradicted those statements in his report, testifying that the properties further east had lower values because that entire area was less desirable. We did not consider Mr. Quillian a credible witness, and we give no weight to that testimony.

considered size an important factor affecting the values of those properties in the eastern part of the county. Indeed, sales 2, 5, and 7 were all sales of properties significantly larger than that in sale 14.[15] We are convinced that size is part of the reason those properties sold for less per acre than properties in some of the other comparable sales.[16]

Both Mr. Roberts and Mr. Ryan considered sales of 400-acre tracts of land. In contrast, one of the weaknesses with Mr. Eidson's assessment of the before value of the property is that he failed to identify any sales of properties of comparable size; indeed, the sale 11 property was less than 10% the size of the subject property. Although Mr. Eidson made adjustments to try to account for the size differential, it is difficult to believe that he could have accurately made those adjustments without considering the demand for 400-acre tracts of land in Muscogee County.

---

[15]Those properties were 4.7, 3.1, and 5.1 times the size of the property in sale 14, respectively.

[16]The property in sale 10 is only 10% larger than that in sale 14, not enough of a difference in size to explain the dramatic difference in price per acre. Mr. Quillian provided little information about that sale, so we do not know what other factors may have influenced the sale price. As noted above, in his report, Mr. Quillian explained that its low price was due to its poor access to the "JR Allen By-Pass" and downtown Columbus.

Another problem with Mr. Eidson's use of sale 11 is that sale 11 was zoned for multifamily use, significantly increasing the value of the property. Mr. Eidson made no adjustment for that factor, stating that the zoning of the sale 11 property was "comparable" to that of the James Butler property. That assessment was unrealistic. Mr. Eidson failed to make a similar adjustment with respect to another of his comparable sales: Mr. Ryan reported that a portion of the sale 3 property was probably going to be used for commercial purposes. Because the zoning on the James Butler property would not have permitted commercial use, Mr. Eidson should have adjusted for the superior use potential of the property in sale 3. As noted above, Mr. Eidson also failed to notice the lot size restrictions affecting 27% of the James Butler property. Finally, Mr. Eidson acknowledged during cross-examination that his report mischaracterized the topography of the James Butler property and that the northern portion was actually more hilly than his report described. That mischaracterization also more generally called into question Mr. Eidson's objectivity. On the basis of the foregoing, we conclude that the before value for the property was substantially less than Mr. Eidson's estimate of $19,500 per acre.

In contrast, the before values estimated by Mr. Roberts and Mr. Ryan were much lower, $10,000 and $12,000 per acre, respectively. However, those

appraisals had a few of their own problems. First, Mr. Roberts failed to consider the lot size restrictions, which would have decreased his estimated before value. Second, neither appraiser accounted for the fact that properties in the eastern part of Muscogee County are not as valuable as properties in the central part of the county. Sales 2, 5, and 7 were approximately two to three miles east of Pierce Chapel Road, the eastern edge of the prime development zone in Muscogee County. That location was slightly inferior to the location of the subject property, and we therefore conclude that Mr. Roberts and Mr. Ryan should have adjusted the values of those sales accordingly. Finally, neither Mr. Roberts nor Mr. Ryan considered sale 4, the Bridgemill property, which was located just south of the subject property on Whitesville Road.

Sale 4 did not close until February 2004, but its price is nevertheless relevant and helpful for appraising the subject property. Although Mr. White and Mr. Brown testified that the topography of 42 to 75 acres of the subject property was superior to that of the Bridgemill property (sale 4), they were not interested in developing the remainder of the James Butler property. Indeed, the topography of the remainder of the property was rocky and hillier than the portion Mr. White and Mr. Brown wanted to buy. The influence that topography can have on value is illustrated by the property in sale 8, which is almost directly across Whitesville

Road from the James Butler property. Although that property was significantly smaller than the James Butler property, it sold during October 2000 for only $10,481 per acre. The land on the west side of Whitesville Road was generally quite hilly, but Mr. Roberts considered the topography of the property in sale 8 comparable to that of the James Butler property. Sale 8 indicates that the value of the northern portion of the property was significantly less than that of the southern portion, and it appears to us to put a ceiling on the value of the northern portion. The northern portion of the James Butler property was also inferior to the Bridgemill property because it lacked access to utilities and because 34% of that portion of the property was subject to a covenant restricting the size of lots and houses.[17] Nonetheless, the February 2004 sale of the Bridgemill property for $22,500 per acre shows recent demand for development in the area of the James Butler property and it, combined with the unaccepted offers, shows that the southernmost portion of the property was exceedingly desirable to developers.

For the foregoing reasons, we conclude that the before value of the James Butler property was slightly higher than the estimates provided by Mr. Roberts and Mr. Ryan. We conclude that the appropriate before value of the property was

---

[17]Although the 107.22 acres affected by the covenants restricting lot and house size is only 27% of the total 393.33 acres, it is 34% of the northern 318.33 acres.

$12,500 per acre, 25% more than Mr. Roberts' before value and 4% more than Mr. Ryan's. As confirmation of the reasonableness of that value, it is approximately equal to the value of the property calculated as follows: $33,000 per acre for the southernmost 42 acres; $17,500 per acre for the next 23 acres; and $10,000 per acre for the remaining 318.33 acres.[18] Accordingly, we conclude that the before value of the James Butler property was $4,916,600.

        b.     The After Value

All of the appraisers stated that they were using the "before and after" approach to value the conservation easement on the James Butler property. To calculate the after value, they all claimed to use either a comparable sales approach or some combination of the comparable sales approach and a discounted cashflow approach. However, because there were no nearby sales of properties encumbered by conservation easements, that task was difficult and the approaches the appraisers used varied widely. Some of the methods they employed were acceptable; others were less so.

---

[18]We note that although a developer purchasing the southernmost portion of the property may have been willing to pay $17,500 or $33,000 per acre for a small portion of the property, the same developer would almost certainly not have been willing to pay those prices for the southernmost portion of the property bundled with the northern portion. Accordingly, that calculation actually establishes a ceiling on the reasonable value of the property.

Mr. Roberts found five sales of land: Two of those sales were from Muscogee County but were not encumbered by conservation easements or any other significant restrictions; two were from distant counties in Georgia and had little development potential because they were largely in flood zones; and one was from North Carolina and was encumbered by a conservation easement. Mr. Roberts attempted to make adjustments to account for the geographic disparity of the properties in distant Georgia counties and North Carolina, but he did not explain his reasoning and his adjustments seem like guesswork. Mr. Roberts subtracted 50% of the value from each of the Muscogee County sales to account for the fact that the properties were not encumbered by conservation easements. He did not explain how he determined that a 50% adjustment was appropriate, and his approach again seems like guesswork. We have repeatedly emphasized that it is essential for appraisers to explain their reasoning because "'[w]ithout any reasoned analysis, * * * [the appraiser's] report is useless.'" Friedman v. Commissioner, T.C. Memo. 2010-45 (quoting Jacobson v. Commissioner, T.C. Memo. 1999-401). Accordingly, we do not accept Mr. Roberts' estimate of the after value.

As part of their approach to estimating the after value of the James Butler property and under the guise of the comparable sales method, Mr. Eidson and Mr.

Ryan both employed a method that we have labeled the "percentage diminution approach". See Friedberg v. Commissioner, T.C. Memo. 2011-238. That approach might also be thought of as the "comparable easements approach". As applied by the appraisers here, the percentage diminution approach consisted of finding other properties encumbered by conservation easements, ascertaining how much those conservation easements decreased the values of the underlying properties, and applying that percentage diminution to the subject property to determine its after value.

Although the appraisers labeled the method they applied the comparable sales method, the two approaches are distinct. In contrast to the percentage diminution approach, an appraiser using the comparable sales method finds sales of similar properties encumbered by easements and makes appropriate price adjustments for time, size, or other significant features. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19. Once similar sales have been found and proper adjustments made, the appraiser uses those adjusted sale prices to determine the after value of the property being appraised. Hilborn v. Commissioner, 85 T.C. at 690; Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19. Perhaps the most significant difference between the comparable sales

method and the percentage diminution method is that the former requires the appraiser to find properties that are close to the property being appraised.

The percentage diminution approach Mr. Eidson and Mr. Ryan employed as part of their appraisals has been accepted by the Court in prior cases. See, e.g., Hughes v. Commissioner, T.C. Memo. 2009-94; Strasburg v. Commissioner, T.C. Memo. 2000-94; Johnston v. Commissioner, T.C. Memo. 1997-475; Losch v. Commissioner, T.C. Memo. 1988-230. The method has been employed most often where, as in the instant case, comparable sales of easement-encumbered properties are not available for the locale of the property being appraised. See Hughes v. Commissioner, T.C. Memo. 2009-94; Losch v. Commissioner, T.C. Memo. 1988-230. When estimating a percentage reduction associated with an easement on a given property, it is essential that an appraiser provide adequate explanation and analysis to justify the percentage. Scheidelman v. Commissioner, T.C. Memo. 2010-151.

From our examination of our past cases dealing with appraisals applying the percentage diminution method, we discern at least two important elements that must be part of the appraiser's analysis. The first element the appraiser must consider is whether the properties have the same highest and best use. Hughes v. Commissioner, T.C. Memo. 2009-94; Strasburg v. Commissioner, T.C. Memo.

2000-94. A conservation easement that changes the property's highest and best use will have a more dramatic impact on the property's value than one that does not. Hughes v. Commissioner, T.C. Memo. 2009-94; Strasburg v. Commissioner, T.C. Memo. 2000-94. Similarly, conservation easements will have different effects on the values of properties with different highest and best uses. Hughes v. Commissioner, T.C. Memo. 2009-94; Strasburg v. Commissioner, T.C. Memo. 2000-94.

The second element the appraiser must consider is the similarity of the terms of the conservation easements; unless the appraisal report includes details about the terms of those other easements, the percentages the appraiser purports to derive are of little utility. Strasburg v. Commissioner, T.C. Memo. 2000-94; Johnston v. Commissioner, T.C. Memo. 1997-475; Losch v. Commissioner, T.C. Memo. 1988-230 . Other things being equal, a very restrictive easement will decrease the value of a property more than a less restrictive easement. Strasburg v. Commissioner, T.C. Memo. 2000-94; Johnston v. Commissioner, T.C. Memo. 1997-475. Accordingly, we will consider both of those elements in our analyses of Mr. Eidson's and Mr. Ryan's use of the percentage diminution approach.

As noted above, Mr. Eidson applied a two-step approach to estimating the after value. He began by finding comparable properties that were already

somewhat undesirable because of their unsuitability for development. All of those

properties were inferior to the James Butler property. He then further reduced the

values of those properties by a percentage diminution that he calculated on the

basis of the effect of other conservation easements. However, Mr. Eidson did not

discuss the terms of any of the other conservation easements. He acknowledged

that many of the other easement transactions had different highest and best uses,

and he stated that those transactions "are not directly comparable" to the

conservation easement on the subject property. The other conservation easements

indicated reductions in value of 40% to 84%, but Mr. Eidson did not attempt to

explain why some of those easements reduced the value of the underlying property

by more than twice as much as others. Indeed, he provided no details regarding

the restrictions imposed by the easements. That omission is significant. We do not

assume, as Mr. Eidson appears to have done, that those dramatically different

reductions in value were random. Rather, we believe those variations were caused

by differences in the transactions, especially differences in terms of the underlying

easements and the highest and best uses of the properties.[19] Because he did not

compare the terms of the conservation easements, Mr. Eidson's analysis is missing

---

[19]Because Mr. Eidson's report is devoid of details regarding the restrictions imposed by those easements, we cannot definitely say why any of those easements reduced the value of the underlying property by more than another.

the second of the elements essential to the sound application of the percentage diminution approach, i.e., an analysis of the similarity of the conservation easements.  See Strasburg v. Commissioner, T.C. Memo. 2000-94; Johnston v. Commissioner, T.C. Memo. 1997-475; Losch v. Commissioner, T.C. Memo. 1988-230.  Accordingly, we conclude that the percentage diminution approach portion of his analysis is not useful.

Even if Mr. Eidson's application of the percentage diminution approach had not been deficient, his two-step method would nonetheless have overestimated the effect of the conservation easement.  He should have applied any percentage diminution to his estimate of the before value of the James Butler property itself, not to a different value that he derived by comparing sales of inferior properties.

However, Mr. Eidson's first step does provide some useful data regarding the value of undevelopable land in Muscogee County.  As noted above, Mr. Eidson failed to appropriately adjust his comparable sales to reflect market appreciation.  After correcting for that error, using 4% annual appreciation, and without adjusting for topography, the comparable sales of undevelopable land range in price from $5,943 to $6,492 per acre, with an average of about $6,300 per acre.  The subject property has topography superior to that of those properties, but its usability is inferior because of the conservation easement.  Although the terms

of the conservation easement permit many of the uses for which buyers would want to possess undevelopable land (e.g., recreation, light farming, and sparse development), it imposes additional legal obligations. The superior topography of the subject property will offset that inferiority to some extent. Accordingly, we conclude that $6,300 per acre represents a useful estimate of the after value of the subject property.

Mr. Ryan was the only appraiser to identify rural estate homesites as the highest and best use of the property after the donation of the conservation easement, a conclusion we find acceptable given the rights reserved by the conservation deeds. Like the other appraisers, Mr. Ryan was unable to find any comparable sales of encumbered properties close to the James Butler property. Mr. Ryan applied several different methods to estimate the conservation easement's effect on the after value, using triangulation to narrow the possible range for that value. Mr. Ryan's first two points of reference were the lowest-priced comparable sale in Muscogee County (sale 5 above) and a 15-year mining lease that decreased the value of the encumbered property by 26%. Mr. Ryan concluded that the conservation easement on the subject property would decrease its value by at least 26%, leaving it below the price of the property in sale 5.

Although both of those conclusions have some merit, they do not come very close to determining an after value for the subject property.

For his third point of reference, Mr. Ryan employed the percentage diminution approach using two conservation easements on rural properties. Unlike Mr. Eidson, Mr. Ryan was careful to analyze the terms of each of those conservation easements and compare them to the easement on the James Butler property. However, his analysis had two shortcomings. Firstly, the "comparable" conservation easements were both significantly more restrictive than the one on the James Butler property. Because of that difference, both of those easements resulted in a greater relative reduction in value than the easement on the James Butler property. Although Mr. Ryan attempted to account for that fact, his attempt to do so was unavoidably inexact.

Secondly, it is unclear whether either of the properties had the same highest and best use as the James Butler property. Mr. Ryan stated that the first of his two comparable properties was unsuited for development and therefore had an inferior highest and best use. That fact led him to conclude that the subject property's value would be reduced by more than the 34% reduction observed on his first comparable property, even though that property was encumbered by a more restrictive easement. Mr. Ryan's report stated that the second property had development potential and

that its zoning permitted some commercial development. Although the commercial zoning would make part of the second property relatively more valuable, the price per acre for that property reflects its rural environs, and Mr. Ryan did not explain whether any development was likely in the relatively near future. Mr. Ryan concluded that the value of the James Butler property would be reduced by less than the 65% observed on his second comparable easement property because its terms were more restrictive than those of the conservation easement on the subject property. Mr. Ryan did not attach much precision to his estimate using the other encumbered properties, stating only that they indicated the effect of the conservation easement on the James Butler property would be a reduction of 34% to 65%.

Although not inconsistent with his conclusion that the conservation easement reduced the property's value by 50%, Mr. Ryan's approach does not offer strong support for that conclusion. His valuation is little bolstered by his consideration of estate lots in Muscogee County because, inter alia, he did not apply the discounted cashflow method, which he would have needed to do in order to accurately estimate the value of the property as separate sales of estate lots. Although we recognize that valuation is far from an exact science, Mr. Ryan's analysis seems very imprecise.

Nonetheless, because Mr. Ryan's valuation is consistent with Mr. Eidson's estimate of the value of undevelopable land in Muscogee County, we conclude that a diminution in value of 50% is acceptable and further conclude that the after value of the James Butler property was $6,250 per acre, or $2,458,300. Because only one of the four appraisers concluded that the conservation easement added any value to the Butler estate, we conclude that the conservation easement did not enhance its value. Accordingly, we conclude that the value of the conservation easement donated by petitioners with respect to the James Butler property was $2,458,300.

B.     The Susan Butler Property

1.     The Appraisal Reports

a.     Mr. Roberts' Appraisal Report

Mr. Roberts concluded that the highest and best use of the Susan Butler property before being encumbered by the conservation easement was for residential development. As with the James Butler property, Mr. Roberts appraised the Susan Butler property using both the comparable sales method and the discounted cashflow method. He used the same comparable sales despite the fact that the Susan Butler property was only about 3% of the size of the James Butler property. Using the comparable sales method and making adjustments, he

concluded that the before value of the Susan Butler property was $15,000 per acre, or $191,000.

To estimate the after value of the Susan Butler property, Mr. Roberts applied the same method he used to estimate the after value of the James Butler property. He concluded that the 10.7 acres encumbered by the conservation easement were worth $5,000 per acre, or about $54,000 and that the 2-acre building site was worth $77,000, which he discounted to $49,000 using the discounted cashflow method. He therefore estimated that the total after value of the Susan Butler property was $103,000.

b.      Mr. Eidson's Appraisal Report

Mr. Eidson concluded that the highest and best use of the unencumbered Susan Butler property was residential development. Mr. Eidson applied the same appraisal approach as he did with the James Butler property, using both the discounted cashflow method and the comparable sales method. Like Mr. Roberts, he used the same comparable sales that he used for the James Butler property despite the fact that the Susan Butler property was a fraction of the size of the James Butler property. He made adjustments to try to account for that size discrepancy. On the basis of his sales comparison approach, Mr. Eidson estimated

that the Susan Butler property was worth $40,000 per acre, or approximately $510,000.

To estimate the after value of the Susan Butler property, Mr. Eidson applied the same two-step method he used on the James Butler property. He estimated that the encumbered 10.7 acres were worth $39,500 in total, or about $3,700 per acre. He estimated that the value of the reserved two-acre building site was $80,000. He therefore estimated that the total after value of the Susan Butler property was $119,500.

### c. Mr. Quillian's Appraisal Report

Mr. Quillian concluded that the highest and best use of the Susan Butler property before the conservation easement was for single-family residential development. Unlike Mr. Roberts and Mr. Eidson and unlike his valuation of the James Butler property, Mr. Quillian used only the comparable sales method to appraise the Susan Butler property. He concluded that because there were sufficient comparable sales of similarly sized and situated tracts of vacant land, the comparable sales method would be more accurate than the discounted cashflow approach. Also unlike Mr. Roberts and Mr. Eidson, Mr. Quillian did not reuse the same comparable sales that he used to value the James Butler property. Instead, he found sales of properties that were more similar in size to the Susan Butler

property. After making various adjustments to his comparable sales, he concluded that the before value of the Susan Butler property was $30,000 per acre, or about $381,100.

To estimate the after value of the Susan Butler property, Mr. Quillian found six sales of land encumbered by conservation easements in rural counties in south Georgia. He stated that none of the properties were comparable to the Susan Butler property. Besides their rural locale, the properties were also significantly larger than the Susan Butler property, ranging from 125 acres up to 3,250 acres. He did not describe the terms of the easements on those properties, but he stated that, to the best of his knowledge, the rights were "equal" to those under the conservation deed on the Susan Butler property. The sale prices for those properties ranged from $400 per acre up to $1,764 per acre. With no explanation, Mr. Quillian deduced from those sales that the value of the encumbered 10.7 acres of the Susan Butler property was $5,000 per acre. On the basis of sales of nearby lots, he estimated that the two-acre building site would sell for $75,000, resulting in a total after value for the Susan Butler property of about $128,500.

### d.  Mr. Ryan's Appraisal Report

Mr. Ryan agreed with the other appraisers that the highest and best use of the property before being encumbered by the conservation easement was for residential

development.  He agreed with Mr. Quillian that the best method for appraising the property was the comparable sales method.  Like Mr. Quillian, Mr. Ryan did not use the same comparable sales to value both the James Butler property and the Susan Butler property; instead, he selected sales of properties that were closer in size to the Susan Butler property.  After adjusting the prices of his comparable sales for various factors including size, Mr. Ryan concluded that the before value of the Susan Butler property was $20,000 per acre, or about $254,000.

Unlike the other appraisers, Mr. Ryan identified a rural estate homesite as the highest and best use of the property after the donation of the conservation easement.  He analyzed the terms of the conservation deed and determined that, in addition to the two-acre building site, the owner would be able to conduct small-scale farming, landscaping, and extensive recreational activities.  On the basis of that determination, he estimated the value of the property by examining sales of comparable estate-style lots in Muscogee and Harris counties.  He examined 20 sales of estate lots ranging in size from 5 acres up to 18 acres and prices ranging from $40,000 to $180,000.  After considering the merits of different comparable sales and comparing factors such as location, size, and scenic features like

lakefronts, Mr. Ryan concluded that the Susan Butler property's after value as an

estate lot was $150,000.

e.    Summary

In summary, the appraisers estimated the following before and after values for

the Susan Butler property:

|  | Roberts | Eidson | Quillian | Ryan |
|---|---|---|---|---|
| Before | $191,000 | $510,000 | $381,100 | $254,000 |
| After | 103,000 | 119,500 | 128,500 | 150,000 |
| Easement value | 88,000 | 390,500 | 252,600 | 104,000 |

2.    Analysis and Conclusion

a.    The Before Value

The appraisers considered the following properties as comparable to the

Susan Butler property:

| ID[1] | Appraisers[2] | Date | Address | Sale price | Size (acres) | Price per acre | 2003 Price[3] |
|---|---|---|---|---|---|---|---|
| 1 | GE, ZR | 12/22/03 | Blackmon Rd. | $1,607,694 | 97.44 | $16,499 | $16,499 |
| 2 | DR | 6/18/98 | Garrett Rd. | 3,705,500 | 423.25 | 8,755 | 10,863 |
| 3 | GE | 12/00 | Veterans Pkwy. | 2,440,994 | 132.00 | 18,492 | 20,801 |
| 4 | GE | 2/19/04 | Bridgemill Dr. | 3,686,265 | 164.83 | 22,500 | 22,280 |
| 7 | DR | 8/16/99 | Macon & Pope Rd. | 2,500,000 | 461.00 | 5,423 | 6,407 |
| 8 | DR | 10/6/00 | Biggers Rd. | 414,000 | 39.50 | 10,481 | 11,790 |
| 11 | GE | 1/03 | Williams Rd. | 1,175,500 | 34.00 | 34,574 | 35,957 |
| 12 | RQ | 12/1/03 | Osprey Cove | 575,000 | 30.50 | 18,852 | 18,852 |
| 13 | DR | 12/16/03 | Williams Rd. | 1,697,500 | 60.80 | 27,918 | 27,918 |
| 15 | RQ | 6/1/01 | Whitesville Walk | 200,000 | 7.53 | 26,578 | 29,316 |
| 16 | ZR | 9/20/01 | Greystone Ct. | 1,280,000 | 45.20 | 28,319 | 30,931 |
| 17 | ZR | 11/15/02 | Warm Springs Rd. | 579,700 | 37.97 | 15,268 | 15,879 |

| 18 | RQ | 12/1/03 | Mobley Rd. | 580,000 | 15.88 | 36,522 | 36,522 |
| 19 | ZR | 12/22/03 | Whitesville Rd. | 1,266,500 | 29.80 | 42,500 | 42,500 |
| 20 | RQ | 4/1/04 | Moore Rd. | 80,000 | 4.20 | 19,048 | 18,862 |
| 21 | RQ | 12/1/04 | Moore Rd. | 87,400 | 4.20 | 20,833 | 20,032 |
| 22 | RQ | 1/1/05 | Whitesville Rd. | 175,000 | 8.79 | 19,909 | 19,143 |

[1]The "ID" field contains numbers which we have assigned to each of the comparable sales for convenience. Because some of the appraisers used the same sales in their appraisal of the James Butler property, we have included those sales with the same identifying numbers, and we have continued the numbering of the new comparable sales with 15, where we left off in our previous table.

[2]The entries in the "Appraisers" field are the first and last initials of each of the appraisers who used that comparable sale in his report: GE = Gregory Eidson; RQ = Rudolph Quillian; DR = David Roberts; and ZR = Zac Ryan.

[3]Prices in this column have been adjusted to December 2003 prices using an estimated 4% annual appreciation (for the reasons explained in the text above), adjusted to the nearest quarter of a year from December 2003 (e.g., sale 2 has been adjusted to reflect 5.5 years of appreciation, sale 4 to reflect -0.25 years, etc.).

As noted in the table above, we have adjusted the above prices to December 2003 prices to reflect 4% annual appreciation. Unlike the James Butler property, no part of the Susan Butler property was substantially more development-ready than another. That fact makes estimating the before value of the Susan Butler property a simpler process. Among the 17 sale records above, there are a number of properties that are very similar to the Susan Butler property without requiring significant adjustments to account for various factors.

Despite the availability of sales of similar properties, Mr. Roberts and Mr. Eidson used the same comparable sales for both the James Butler property and the Susan Butler property. Given the drastic difference in size between those two properties and between the "comparable" properties and the Susan Butler property,

we question their failure to use sales of more similarly sized properties.  Although they tried to account for differences in size between the Susan Butler property and those in their comparable sales, their adjustments appear unsupported and their resulting valuations do not match the observed sales of similarly sized properties in Muscogee County.  Neither Mr. Roberts nor Mr. Eidson provided an adequate rationale for his failure to find sales of properties that were of comparable size.  Accordingly, we will give little weight to Mr. Roberts' and Mr. Eidson's estimates of the before value of the Susan Butler property.

Because we conclude that there is a sufficient number of truly comparable sales, we will exclude some of the sales that we do not find comparable.  Properties in sales 11, 13, 15, 16, 18, and 19 were all zoned for denser development than the Susan Butler property.  Those differences in zoning resulted in substantially higher prices for those properties, ranging from $27,918 to $42,500 per acre.  Properties in sales 15, 16, 18, and 19 were also significantly closer to downtown Columbus, further inflating their prices.  Properties in sales 2, 3, 4, and 7 were substantially larger than the Susan Butler property, deflating their prices.  Accordingly, we will not consider those sales except insofar as we consider sale 4, of the Bridgemill property, as a point of reference.  Finally, we will not consider sale 8 because the property was inferior to the Susan Butler

property in two respects: it had less desirable topography and lacked access to sewer lines, resulting in a significantly lower price of $11,970 per acre.

The properties in the other six sales were all either close to the Susan Butler property or similarly situated vis-a-vis downtown Columbus. They demonstrate a relatively narrow range of prices, from $15,879 to $20,032 per acre. We will consider a few minor adjustments to those prices to account for the following differences in the properties:

| ID | Size (acres) | 2003 $/Acre | Superior qualities | Inferior qualities |
|----|----|----|----|----|
| 1 | 97.44 | $16,499 | | No sewer, size |
| 12 | 30.50 | 18,852 | | Partial flood zone, topography, size |
| 17 | 37.97 | 15,879 | Slightly denser development | Size |
| 20 | 4.20 | 18,862 | Size | |
| 21 | 4.20 | 20,032 | Size | No sewer |
| 22 | 8.79 | 19,143 | Size | No sewer, 20%  flood zone |

Properties in sales 1, 12, and 22 were generally inferior to the Susan Butler property while properties in sales 21 and 17 had offsetting qualities and that in sale 20 was generally superior. On the whole, we believe that the Susan Butler property would have commanded a slightly higher price than any of those properties.

We also consider sale 4, the Bridgemill site, because of its proximity to the Susan Butler property both in time and geography. The Bridgemill property sold a

few months after the valuation date for $22,500 per acre.  As noted above, Mr. White considered that property inferior to the choicest sections of the James Butler property, but Mr. White did not indicate any interest in the Susan Butler property and it was not one of the properties in Muscogee County that he considered ready for development.  Accordingly, we infer that the Susan Butler property was somewhat inferior but generally similar in quality to the Bridgemill site, which was just south of it.  Because the Bridgemill site was much larger, the Susan Butler property would have sold for a relatively higher price per acre, offsetting its inferior quality to some degree.

On the basis of the foregoing, we conclude that the Susan Butler property was worth $22,000 per acre in the before condition, or $279,400.

> b.     The After Value

For the same reasons we explained above with respect to the James Butler property, we conclude that Mr. Eidson's and Mr. Roberts' methods of appraising the after value of the Susan Butler property were unacceptable and overestimated the loss in value attributable to the easement.

Mr. Quillian attempted to use the comparable sales method to estimate the after value of the property, but the only sales of easement-encumbered land that he was able to find were sales of large tracts in rural portions of south Georgia.

Although he attempted to correct for the differences due to size and location, he did not explain his adjustments and his conclusion seems arbitrary. He also failed to describe the terms of the easements encumbering the south Georgia properties he considered. Those failures were significant, and consequently we attach little weight to Mr. Quillian's conclusion regarding the after value.

Mr. Ryan was the only appraiser to carefully consider the terms of the conservation deed and to determine that the highest and best use of the property after being encumbered by the conservation easement was for a rural estate. We agree with his determination and generally found his appraisal method of considering sales of other rural estates to be acceptable. However, we believe that he failed to adequately consider the reduction in value from the conservation easement. The conservation easement would require any owner of the Susan Butler property to comply with the terms of the conservation deed. Even if those terms do not interfere with the normal use of rural estate lots, they do impose additional requirements on the owner, making the Susan Butler property less attractive. Consequently, we believe Mr. Ryan's after value should be adjusted downward slightly to $140,000.

That value is slightly more than the March 2003 sale price of an interior 13.5-acre estate lot in the north of Harris County, a significantly inferior location.

That property sold for $130,000, or approximately $134,000 adjusted to December 2003 pricing. Several sales of interior estate lots in Muscogee County during 1999 show that, adjusted to December 2003 prices, estate lots of about six to seven acres sold for approximately $140,000. Because the Susan Butler property is twice as large as those lots, we believe its size would make it as attractive as those smaller lots despite the conservation easement. Consequently, those sales indicate that $140,000 is an acceptable estimate of the after value for the Susan Butler property. Accordingly, we conclude that the value of the conservation easement petitioners donated with respect to the Susan Butler property was $139,400.

Issue 3. Whether Petitioners' Contribution of a Conservation Easement on the Kolomoki Plantation Properties Was a Qualified Conservation Contribution Under Section 170(h)

Background

Petitioners acquired the property known as Kolomoki Plantation through three separate purchases during 2001. In all, petitioners acquired approximately 5,600 acres.

The Kolomoki Plantation is in Early and Calhoun Counties in the southwestern corner of Georgia. During 2004, Early County had a population of approximately 12,091, and Calhoun County had a population of approximately

6,320. Both Calhoun and Early Counties are primarily agricultural, and the area is very rural. The closest stores and schools are in Blakely, a small town approximately eight miles south of Kolomoki Plantation.

Viewed from the north, Kolomoki Plantation's irregular shape resembles a pointing dog, its front leg raised to indicate the presence of game. That shape is appropriate because the property is primarily a "shooting plantation", though it is also used for agriculture and silviculture. Kolomoki Plantation is similar to other nearby shooting plantations, which are common in the neighborhood. The property has been used as a shooting plantation for at least three decades, but petitioners have converted more of the agricultural land into quail habitat since they acquired the property.

Improvements on Kolomoki Plantation include a main lodge with guest house, a headquarters office, a maintenance barn, a manager's house, a grain storage facility, four tenant houses, two equipment shelters, kennels, and a hayfield cabin. The main lodge and guest house overlook a 25-acre pond, the largest of seven manmade ponds on the property. Near the main lodge, petitioners maintain a hayfield of approximately 30 acres, which includes fenced pasture for horses. That field has been used as a landing strip for private aircraft.

On December 29, 2003, the L.L.C. contributed to COLT a conservation easement on 1,780 acres of Kolomoki Plantation (2003 easement). Referring to the above description of the property's shape as a pointing dog, the 2003 easement covered the portions of the property corresponding to the dog's hind legs and tail, its front legs, and its snout. It did not cover the torso or the remainder of the head. On December 23, 2004, the L.L.C. contributed a second easement on 2,450 additional acres of Kolomoki plantation (2004 easement). The 2004 easement covered various noncontiguous portions of the property not covered by the 2003 property. The remainder of the property that is not subject to either the 2003 or 2004 easement has been reserved for use as a wetland mitigation bank.[20]

Petitioners engaged Louis E. Clark to appraise the 2003 and 2004 easements. Mr. Clark prepared appraisal reports that the L.L.C. attached to its 2003 and 2004 Forms 1065. During the course of his examination, respondent

---

[20]A mitigation bank is "a wetland, stream, or other aquatic resource area that has been restored, established, enhanced, or (in certain circumstances) preserved for the purpose of providing compensation for unavoidable impacts to aquatic resources permitted under Section 404 [of the Clean Water Act] or a similar state or local wetland regulation." U.S. Environmental Protection Agency, Mitigation Banking Factsheet, available at http://www.epa.gov/owow/wetlands/facts/fact16.html. The mitigation bank receives "compensatory mitigation credits" commensurate with the amount of wetlands restored, which it may sell to third parties who must purchase such credits before they can damage existing wetlands. Id.

reviewed Mr. Clark's reports and raised various questions about them. Mr. Clark prepared a supplemental report in which he attempted to address those questions. Unfortunately, Mr. Clark died on May 30, 2009, and was therefore unavailable to testify at trial. In preparation for the instant litigation, petitioners engaged R. Bryan Almand to perform a retrospective valuation of the 2003 and 2004 easements. Mr. Almand testified at trial.

The deeds of conservation easement through which the L.L.C. conveyed the 2003 and 2004 easements to COLT significantly restrict petitioners' use of Kolomoki Plantation, but nonetheless reserve a number of rights. The 2004 conservation deed amends several portions of the 2003 conservation deed, enlarging the portion of the property encumbered by the easement and permitting the encumbered property to be subdivided into 15 tracts instead of only 5. The 2004 amendment also applies to the 2003 easement, and both the 2003 and 2004 conservation easements are subject to the same restrictions. Because both the 2003 and 2004 easements are subject to the 2003 conservation deed as amended by the 2004 amendment, we shall refer to only one conservation deed. The conservation deed begins with a series of recitals, proclaiming general conservation values and purposes. It incorporates by reference three attachments: a legal description of the property, a forest management plan, and a baseline

documentation report.  Article II of the conservation deed details certain rights that are expressly prohibited, restricted, permitted, or reserved.

The conservation deed permits all existing agricultural, grazing, and horticultural uses of Kolomoki Plantation to continue.  Additionally, it permits areas that were once fields but in which there is now growing timber, as described in the baseline documents, to be reclaimed for agricultural use at any time.  The maps in the baseline documents (i.e., the environmental reports) show that the land available for cultivation makes up at least 75% of the easement area.[21]  The conservation deed allows the use of agrichemicals such as fertilizers, insecticides, herbicides, pesticides, and rodenticides provided their use does not have a "demonstrable detrimental effect on the Conservation Purposes".  The deed prohibits certain industrial agricultural practices such as feed lots, and it prohibits the importation of game farm animals other than whitetail deer or game birds.  It permits the commercial operation of hunting clubs and the lease of land for hunting purposes.  It also permits commercial timber harvesting consistent with a timber management plan approved by COLT provided that such timber harvesting is not "detrimental to the scenic, historic, natural area and rare species habitat

---

[21]Such land includes the land on the maps labeled "Crop field", "Brushy field", "Planted Pine/Open Pine Forest", and "Horse Pasture and Barn".

protection, wildlife and game habitat protection, and sustainable forestry purposes".

The conservation deed prohibits the dumping of nonbiodegradable wastes on the property, but permits the dumping of biodegradable wastes removed from the property as long as such wastes are not visible from roads and are at least 200 feet from any watercourse. Mining, excavation, and dredging are prohibited except insofar as those resources are used on the property itself and only if the area excavated is restored to the appropriate grade.

The conservation deed permits Kolomoki Plantation to be subdivided into up to 15 tracts of land, provided that each tract is at least 200 acres. Any subdivided portion of the original property remains subject to the terms of the conservation deed. The L.L.C. may transfer any of the subdivided lots to any purchaser, but for transfers made after December 31, 2013, transfers to anyone other than one of petitioners' descendants are subject to a transfer fee of 0.5% of the purchase price that is payable to COLT's stewardship fund.

The owner of any subdivided portion of less than 500 acres is permitted to build the following structures on a 5-acre building envelope: a single-family residence; an unlimited number of nonresidential buildings such as garages, gazebos, sheds, boat houses, and other recreational facilities; a secondary

residential building for each additional 100 acres beyond the first 100 acres; and farm buildings of not more than 4,500 square feet under roof. Such residential buildings may be rented to tenants. Additionally, with permission from COLT, the owner may construct any such nonresidential agricultural and recreational structures "as may be reasonably necessary for the uses permitted". The owner of any subdivided portion of more than 500 acres is permitted to construct a headquarters site of up to 15 acres, which may contain the following structures: two residential dwellings; one lodge for temporary guests; three guest houses; and any number of sheds, barns, kennels, garages, picnic shelters, and barns "reasonably necessary to conduct permitted activities". The total ground coverage under roof at each headquarters site is not to exceed 15,000 square feet. Although no house on the headquarters site may be used as condominiums or apartments for tenants, the houses may be leased, including to paying members of a hunting club. The location of all headquarters sites and building envelopes is subject to approval by COLT.

The conservation deed permits the construction of permeable roads and driveways to access any permitted structure. It also permits the owner to construct and maintain a private grass airstrip to access Kolomoki Plantation. The conservation deed allows the construction of new ponds and lakes in locations

subject to the approval of COLT. Except for the uses and activities expressly granted under the conservation deed, the deed prohibits all other development. Additionally, the conservation deed prohibits any use that would impair or destroy significant conservation values. The conservation deed does not permit the public to enter Kolomoki Plantation.

The conservation deed grants COLT the right to enter Kolomoki Plantation periodically to inspect the property and ensure that the landowners are complying with the terms of the conservation deed. Staff from COLT visit Kolomoki Plantation twice a year to ensure that petitioners are complying with the terms of the conservation deed. COLT also has the right, if it determines that the conservation values have been damaged, to require that the owners restore Kolomoki Plantation to the condition required by the conservation deed.

The baseline documentation referred to in the conservation deed consists of reports prepared by the environmental consultants, Ms. Mote and Ms. Bouthillier. Those environmental reports are identical in all material respects to the environmental reports Ms. Mote and Ms. Bouthillier prepared with respect to the Muscogee County properties. Although they describe different properties and list different species, the conclusions and recommendations in both sets of reports are nearly identical and use the same language. As with the Muscogee County

properties, the environmental consultants provided supplemental environmental reports in 2010, which include a new section in which they more specifically address conservation purposes as provided in the Code and the regulations.  The supplemental environmental reports specifically identify certain high-quality terrestrial and aquatic communities found on Kolomoki Plantation.  For instance, the supplemental report with respect to the 2003 easement stated:

> During the 2003 surveys, high quality aquatic and terrestrial communities were identified on all of the Kolomoki Tract subparcels (North Lane, Odom, and U.S. 27).  These communities were described in the Baseline Report as Hardwood Forest, Pine Forest, Open/Brushy Fields, and Open Water.

> The Upland Hardwood Forests occur primarily on the North Lane and U.S. 27 subtracts of the Kolomoki Tract.  These areas are primarily sandy loams with a high diversity of mature upland hardwood trees.  Much of the native upland hardwood forests in this region have been cut down for farming and silviculture use.  Upland Hardwood Forests provide habitat for species on the state, federal, and CWCS [Comprehensive Wildlife Conservation Strategy for Georgia] High Priority Species lists.

> Pine Forests and Open/Brush Fields provide suitable habitat for migratory song birds, reptiles, and small mammals that have been listed as species deserving of protection.  Pine Forests and Open/Brush Fields were found on all of the Kolomoki Tract.  Managing the pine areas for long leaf pine and encouraging brushy open areas will continue to attract many wildlife species which are protected or species of concern.

> The 2003 surveys also identified high quality aquatic communities in Little Kolomoki Creek and Spring Creek, their tributaries, and associated floodplain hardwoods.

The supplemental report with respect to the 2004 easement identified similar high-quality ecosystems on that portion of Kolomoki Plantation.

Although the environmental consultants did not find any rare, endangered, or threatened species on Kolomoki Plantation, they identified habitat on the property that is normally home to several species that are considered rare, endangered, or threatened:  variable-leaf Indian plantain (a plant found in swamps and muddy streams); Florida willow (a plant found in swamps and muddy streams); chaffseed (a plant found on the edges of ponds and wet grassy areas); spotted bullhead (a fish found in large streams with moderate current and rocky bottoms); bluestripe shiner (a fish found in large creeks with rocky bottoms); Bachman's sparrow (a bird found in open pine woods and old pastures with dense ground cover); and alligator snapping turtle (a reptile found in rivers, lakes, swamps, and large ponds).

The supplemental environmental reports do not mention any of the L.L.C.'s retained rights besides the following brief discussion of the reserved building envelopes:  "Even with the retained rights for building envelopes, the Kolomoki Tract would maintain the scale of rural residential open space historically present in the region.  High quality of life associated with open space and wildlife is exemplified in the Kolomoki Tract."

Discussion

A.    Legal Standard

The legal standard with respect to whether the L.L.C.'s contributions of the

conservation easements on Kolomoki Plantation were "qualified conservation

contributions" under section 170(h) is the same as that explained above with respect

to the Muscogee County properties.  For the reasons explained below, we conclude

that the L.L.C.'s contributions satisfy the section 170(h)(4)(A)(ii) conservation

purpose of protecting a relatively natural habitat (conservation purpose).

Accordingly, we need not address petitioners' alternative argument that the

contributions protect open space pursuant to section 170(h)(4)(A)(iii).

We must consider what rights are reserved under the conservation deed and

decide whether, if Kolomoki Plantation were developed to the extent permitted by

the conservation deed, the conservation purpose would be preserved in perpetuity as

required by section 170(h)(5)(A).

B.    What Rights Are Reserved Under the Conservation Deeds?

As described above, the conservation deed preserves numerous rights for

the L.L.C., subject to the overarching language in the conservation deed preserving

the conservation purposes.  The L.L.C. may subdivide the portion of Kolomoki

Plantation encumbered by the conservation easement into 15 smaller plots of at least

200 acres and sell off those portions of the property. After December 31, 2013, any of those sales to anyone other than one of petitioners' descendants would be subject to a 0.5% transfer fee. Any subsequent owners of those properties would be able to operate them as farms, private shooting plantations, or hunting clubs. Although farming is not permitted in areas of older forests, such areas make up a small percentage of the property. The conservation deed imposes a few restrictions on the manner of farming, including prohibitions on certain industrial farming practices and limits on the use of chemicals that would result in demonstrable damage to the ecosystems on the property. Similarly, although commercial timber harvesting is permitted, the conservation deed and the forest management plan limit the manner in which such harvesting may occur.[22]

---

[22]The parties disagree about whether the conservation deed effectively incorporates by reference the unrecorded environmental reports and the forest management plan. For the reasons explained above with respect to a similar dispute regarding the conservation deeds on the Muscogee County properties, we agree with petitioners that those documents were appropriately incorporated by reference under Georgia law. Accordingly, the restrictions in those documents are applicable.

C.    Does the Conservation Deed Preserve the Conservation
      Purposes in Perpetuity?

As with respect to the conservation easements on the Muscogee County

properties, the record concerning whether the conservation deed preserves the

conservation purpose in perpetuity is sparse.  Although the environmental reports

and supplemental environmental reports show that Kolomoki Plantation as it existed

in 2003 and 2004 provided significant relatively natural habitat, those reports do not

establish that the conservation deed effectively preserves that relatively natural

habitat.  At trial, Ms. Bouthillier testified as follows regarding the reserved rights on

the Kolomoki Plantation:

> Q. And you're familiar with some of the retained rights on both sets of
> properties.  And with respect to the retained rights on Kolomoki from an
> ecological point of view there are retained rights for a lodge if there's a 500-
> acre -- are you familiar with those limitations?
>
> A. Yes, sir.
>
> Q. Do you view that as a good thing or a bad thing from an ecological
> perspective.
>
> A. I think that reserving the right to have future areas and have access
> to those areas is important, because it involves the usage by other people.  So
> if you've got -- for instance, if you've got a large tract of land -- thousands of
> acres -- with access to road what I see day in and day out is those areas
> become dumping grounds because -- just the other day last week I spoke with
> somebody and he said, "I haven't been to this part of my property in 25
> years."  And so at that point in time, you know, people had been dumping on

his property. And so I think it's important to maintain like-minded people to have access to the conservation properties.

Q. And would you include in that like-minded group hunters?

A. Yes, sir.

Ms. Mote agreed, also testifying that the building envelopes did not interfere with the conservation purpose. She stated:

> You know, if we have -- if we put a structure in a spot on 500 acres -- one structure, two structures, five structures -- versus going in and mowing the whole thing down and putting in half-acre, one-acre lots that's a huge difference. So, you know, it's not going to affect that significantly with that small amount of structures on a 500-acre parcel.

As with our discussion above concerning the conservation easements on the Muscogee County properties, we conclude that petitioners have presented credible evidence--in the form of the expert testimony described above, the overarching rights granted to COLT in the conservation deed, and the evidence that COLT regularly monitors Kolomoki Plantation--that the conservation deed preserves the conservation purpose, and the burden of proof therefore shifts to respondent. Because respondent offered no contrary expert witness testimony and pointed to no evidence that would suggest that COLT is likely to abandon its right to enforce the conservation deeds, we conclude that petitioners have established that the conservation deed protects significant habitat and therefore satisfies the

requirements of section 170(h)(4)(A)(ii) and section 1.170A-14(d)(3), Income Tax Regs.

Issue 4. The Proper Value of the Conservation Contributions with Respect to Kolomoki Plantation

Discussion

A.    The Admissibility of the Clark Reports

Mr. Clark wrote appraisal reports with respect to the 2003 and 2004 conservation easements on Kolomoki Plantation (Clark reports). Because Mr. Clark died before trial, he was unable to testify about those reports. The parties agree that the Clark reports are admissible for the nonhearsay purposes of showing what petitioners relied upon when they calculated their deductions and showing that petitioners cooperated with respondent during his examination. The parties also agree that because of Mr. Clark's unavailability to testify, the reports constitute hearsay if offered for the truth of the matters contained therein. However, petitioners contend that the Clark reports are admissible pursuant to one or more hearsay exceptions. Respondent disagrees.

Generally, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The term "statement" includes written

assertions.  Fed. R. Evid. 801(a)(1).  Hearsay is not admissible to prove the truth of the matter asserted unless an exception to the hearsay rule applies.  See Fed. R. Evid. 802, 803, 804, 807.  In general, we will not admit an appraisal report as evidence of fair market value unless the author of the report testifies at trial and is available for cross-examination.  Van Der AA Invs., Inc. v. Commissioner, 125 T.C. 1, 7 (2005); see also Evans v. Commissioner, T.C. Memo. 2010-207; Droz v. Commissioner, T.C. Memo. 1996-81.  We have applied that general rule to exclude an appraisal report where the appraiser died before trial and therefore was unavailable to testify.[23]  See Waddell v. Commissioner, 86 T.C. 848, 878 (1986), aff'd, 841 F.2d 264 (9th Cir. 1988).

Petitioners contend that the Clark reports are admissible under rule 804(b)(1) of the Federal Rules of Evidence, which states:

_____

[23]Petitioners contend that other courts have admitted reports from deceased experts, and they cite two cases in support of that contention.  In United States v. Parks, 68 F.3d 860 (5th Cir. 1995), the court dismissed the criminal defendant's argument that the Government's delay in bringing charges had prejudiced the defendant because, inter alia, the author of some appraisal reports died before trial. In dismissing the defendant's argument, the Court of Appeals noted that the trial court had admitted the appraisal reports because the Government had not objected to their admission.  The admissibility of those reports was not at issue in that case, and it therefore does not support petitioners' contention.  The second case cited by petitioners, United States v. Thevis, 84 F.R.D. 57 (N.D. Ga. 1979), has nothing to do with the admissibility of expert reports.  Rather, the issue in that case concerned the admissibility of a murdered witness's prior testimony before a grand jury. Accordingly, neither of the cases petitioners cited supports their contention.

> Former testimony.  Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.[24]

Petitioners contend that the Clark reports are admissible under that exception because respondent interviewed Mr. Clark during respondent's examination and because Mr. Clark submitted supplemental reports in response to questions raised during the examination.  We disagree.  Respondent's interview with Mr. Clark during the examination of petitioners' returns was not at a hearing and respondent

---

[24]Effective December 1, 2011, Fed. R. Evid. 804(b)(1) was amended to read:

(b) The Exceptions.  The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

  (1) Former Testimony.  Testimony that:

    (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

    (B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Those changes are "intended to be stylistic only" and not "to change any result in any ruling on evidence admissibility."  Fed. R. Evid. 804 advisory committee's note.

did not have the opportunity to cross-examine Mr. Clark under oath. As the Court

of Appeals for the Sixth Circuit has explained:

> A hearing connotes some kind of adversarial proceeding presided over by an impartial third party, while "deposition" is a term of art referring to the out-of-court adversarial questioning of a witness under oath. Writing and signing a narrative affidavit during an interview with Government officers plainly is not the same as testimony given during a hearing or deposition.

United States v. Hunt, 521 F.3d 636, 643 (6th Cir. 2008). The interview and signed

affidavit in that case are similar to the interview with Mr. Clark and his

supplementary report in the instant case, and we find the Court of Appeals'

reasoning persuasive. We have similarly held that a signed affidavit from a

deceased attorney was not admissible under rule 804(b)(1) of the Federal Rules of

Evidence because it was "not testimony from a prior hearing or deposition and

respondent had no opportunity to cross-examine" the affiant. Escobar v.

Commissioner, T.C. Memo. 1983-205. Accordingly, we conclude that the Clark

reports are not admissible pursuant to rule 804(b)(1) of the Federal Rules of

Evidence.

Petitioners also contend that the Clark reports are admissible pursuant to rule

807 of the Federal Rules of Evidence, under which hearsay not covered by the

exceptions in rule 803 or 804 but having "equivalent circumstantial guaranties of

trustworthiness", is admissible:

if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of * * * [the Federal Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence. * * *[25]

The Court of Appeals for the Eleventh Circuit has affirmed that the residual exception under rule 807 of the Federal Rules of Evidence is to be used "'very rarely, and only in exceptional circumstances'" and that it "'appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of

---

[25]Effective December 1, 2011, the applicable language of Fed. R. Evid. 807 was amended to read:

(a) In General.  Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

Those changes are "intended to be stylistic only" and not "to change any result in any ruling on evidence admissibility."  Fed. R. Evid. 807 advisory committee's note.

probativeness and necessity are present'".  United Techs. Corp. v. Mazer, 556 F.3d

1260, 1279 (11th Cir. 2009) (quoting United States v. Ingram, 501 F.3d 963, 967

(8th Cir. 2007), and United States v. Wright, 363 F.3d 237, 245 (3d Cir. 2004)).

The Clark reports are inadmissible under rule 807 of the Federal Rules of

Evidence both because they lack equivalent circumstantial guaranties of

trustworthiness and because they are not more probative than any other evidence

available to petitioners.  Petitioners argue that the Clark reports have equivalent

circumstantial guaranties of trustworthiness because they were not prepared for

purposes of litigation and because Mr. Clark held the MAI designation and was

therefore bound to high standards of accuracy.  However, petitioners' arguments run

contrary to the Court's experience reviewing appraisal reports that taxpayers have

submitted with their returns.  We have observed that there is a "cottage industry of

experts who function primarily in the market for tax benefits", Boltar, L.L.C. v.

Commissioner, 136 T.C. 326 335 (2011), and we have frequently concluded that

appraisals submitted with taxpayers' returns overstated the values of claimed

deductions even when those reports were prepared long before the commencement

of litigation, see id.; Jacobson v. Commissioner, T.C. Memo. 1989-606; Fannon v.

Commissioner, T.C. Memo. 1989-136.  On the basis of the foregoing, we reject

petitioners' contention that the Clark reports have circumstantial guaranties of trustworthiness.

Additionally, we note that the Clark reports are not more probative than any other evidence petitioners can produce. Indeed, petitioners have produced reports appraising Kolomoki Plantation written by Mr. Almand.

On cross-examination during trial, respondent effectively attacked the conclusions of many of petitioners' appraisers, and we conclude that it would not be in the interests of justice to admit the Clark reports without allowing respondent to have the opportunity to cross-examine Mr. Clark. Accordingly, we conclude that the Clark reports are inadmissible hearsay.[26]

B.      Valuing the Easements on Kolomoki Plantation

1.      The Appraisal Reports

a.      Mr. Almand's Appraisal Report

Mr. Almand is a self-employed real estate appraiser in Valdosta, Georgia. His work is primarily concentrated in southern Georgia. Mr. Almand has more

---

[26]Petitioners had also sought admission of the Clark reports under the guise of a "desk review" conducted by Mr. Quillian. Respondent filed a motion in limine to exclude Mr. Quillian's testimony regarding those desk reviews. However, at trial, petitioners abandoned their attempt to have the Clark reports admitted through Mr. Quillian. Accordingly, we have denied respondent's motion as moot.

than 40 years of experience appraising properties, and he holds the MAI designation from the Appraisal Institute. His clients have included the Georgia Department of Natural Resources, the Nature Conservancy, the Georgia Power Company, many banks, and several railroads.

Mr. Almand concluded that the highest and best use of Kolomoki Plantation before the donation of the conservation easements was its current use, a working farm and shooting plantation. To estimate the before value of the property, Mr. Almand used the sales comparison approach. He found nine sales of comparable properties and made various adjustments to each, including adjustments for the value of timber and improvements. After making those adjustments, he found that the six sales of properties he considered most comparable to Kolomoki Plantation had adjusted prices ranging from $2,186 to $2,938 per acre. Of those sales, four were within the range of $2,559 to $2,772 per acre. On the basis of those numbers, Mr. Almand estimated that the before value of Kolomoki Plantation was $2,650 per acre, or about $14,900,000.[27]

Mr. Almand concluded that the highest and best use of the property was unchanged after the donation of the conservation easements, but he noted that the

---

[27]Mr. Almand included the value of improvements, which he estimated to be $1,330,000, or $237 per acre, when he estimated the before value of Kolomoki Plantation.

property could no longer be subdivided into as many smaller tracts of land as it could have been before the donation. Combined with the other restrictions imposed by the conservation deeds, Mr. Almand concluded that the diminished subdivision rights decreased Kolomoki Plantation's value despite its unchanged highest and best use. To estimate the magnitude of that effect, Mr. Almand applied the percentage diminution approach, considering the impact of conservation easements on a number of properties in south Georgia and north Florida. He concluded that the conservation easement reduced the value of the encumbered portion of Kolomoki Plantation by 40%, or by approximately $2 million.

To estimate the value of Kolomoki Plantation before the donation of 2004 easement, Mr. Almand adjusted the 2003 after value of the property to account for market conditions, timber growth, fluctuations in the price of timber, and the value of timber that had been harvested during 2004. He estimated that the 2004 before value was $2,432 per acre, or about $13,650,000.

Mr. Almand applied the same method to value to the 2004 easement, and he concluded that the 2004 easement also diminished the value of the encumbered portion by 40%. He therefore estimated that the value of the 2004 easement was $2,700,000. Mr. Almand did not consider the mitigation bank when he appraised

the property because he reported that no portion of the mitigation bank was approved by the U.S. Army Corps of Engineers until 2005.

### b.     Mr. Ryan's Appraisal Report

Mr. Ryan concluded that the highest and best use of the Kolomoki Plantation property before the donation of the conservation easements was a combination of agricultural, silvicultural, and recreational uses, combined with low-density rural residential development.  He noted that there was also potential to use the property as a mitigation bank.  He used the sales comparison approach to estimate the before value of the property.  He found seven sales of comparable properties, five of which were also sales considered by Mr. Almand.  Mr. Ryan adjusted the sale price of each of those properties to account for the value of timber on each property and to exclude value contributed by improvements, quotas, and personalty.  However, he made no adjustment to account for appreciation because he determined that the market for shooting plantations was stable during that period.  He then evaluated each of the seven comparable properties, determining whether those properties were superior or inferior to Kolomoki Plantation.  He determined that the before value of Kolomoki Plantation was more than $2,267 per acre but less than $2,380 per acre. On that basis, he estimated that the value of Kolomoki Plantation was $2,300 per

acre, or $12,880,000. Unlike Mr. Almand's before value, Mr. Ryan's before value does not include the value of improvements on the property.

Like Mr. Almand, Mr. Ryan concluded that the highest and best use of the property was unchanged after the donation of the conservation easement. However, he stated that the agricultural and silvicultural uses were "nominally restricted" and the density of the property's residential development potential was decreased. To estimate by how much those restrictions decreased Kolomoki Plantation's value, Mr. Ryan used two methods: the percentage diminution approach and what he termed a "revised sales comparison approach" in which he reconsidered whether Kolomoki Plantation was inferior or superior to the sales of comparable properties he already considered. When he applied the latter method, Mr. Ryan concluded that the property was inferior to all but two of his comparable properties, and he considered Kolomoki Plantation to be comparable to those properties after the easement. That method led him to conclude that the 2003 after value of the property was $2,000 per acre.

To apply the percentage diminution approach, Mr. Ryan considered the same three sales that he considered with respect to the Muscogee County properties, described above. Mr. Ryan concluded that the conservation easement on Kolomoki Plantation diminished the encumbered portion of the property by more than the 15-

year mining lease. However, he concluded that the diminution in value was less than the 34% or 65% diminution observed on his other two comparable sales. He compared the terms of the 2003 easement to the easements on both of those properties and concluded that the easement on Kolomoki Plantation was less restrictive than either of them. He noted that the easement on the property with a 34% diminution forbade all subdivision of the 1,219-acre tract, that it permitted the construction of only two residences and one barn, that it permitted no new road construction, and that it had more restrictions on the agricultural and silvicultural uses of the property than did the easement with respect to Kolomoki. Mr. Ryan concluded that the 2003 easement diminished the value of the encumbered portion of Kolomoki Plantation by 30%, to approximately $2,077 per acre.

Mr. Ryan subsequently reconciled his estimate of the after value using the percentage diminution method and his revised sales comparison approach. He concluded that the 2003 after value of Kolomoki Plantation was $11,400,000, or approximately $2,036 per acre. He therefore concluded that the value of the 2003 conservation easement was $1,480,000.

Instead of merely adjusting his 2003 after value to arrive at a before value with respect to the 2004 Kolomoki easement, Mr. Ryan again used the comparable

sales method to analyze the property's before value. He used the same seven sales that he used to estimate the 2003 before value, and he also added another sale from 2004. Mr. Ryan concluded that the mitigation bank increased the property's value more than the conservation easement decreased it. He considered the value of Kolomoki Plantation before the donation of the 2004 easement to be between $2,267 per acre and $2,794 per acre, concluding that it was worth approximately $2,400 per acre, or about $13,440,000.

To estimate the 2004 after value, Mr. Ryan used the same two methods described above with respect to the 2003 easement. Using his revised sales comparison approach, he estimated that the 2004 after value of Kolomoki Plantation was $2,100 per acre. Using the percentage diminution approach, he again estimated that the conservation easement diminished the value of the encumbered portion of the property by 30%. On the basis of that percentage diminution, he calculated that the 2004 after value of Kolomoki Plantation was approximately $2,085 per acre. Mr. Ryan reconciled his two approaches by choosing a number in the middle, estimating that the after value was $11,700,000, or approximately $2,089 per acre. He therefore concluded that the value of the 2004 easement on Kolomoki Plantation was $1,740,000.

c. <u>Summary</u>

In summary, the appraisers estimated the following before and after values for Kolomoki Plantation:

|  | <u>Almand 2003</u> | <u>Ryan 2003</u> | <u>Almand 2004</u> | <u>Ryan 2004</u> |
|---|---|---|---|---|
| Before | $14,900,000 | $12,880,000 | $13,650,000 | $13,440,000 |
| After | 12,900,000 | 11,400,000 | 10,950,000 | 11,700,000 |
| Easement value | 2,000,000 | 1,480,000 | 2,700,000 | 1,740,000 |

2. <u>Petitioners' Attempt To Impeach Mr. Ryan</u>

During cross-examination, petitioners attempted to impeach Mr. Ryan using several appraisal reports he had written for other clients. Petitioners focused most of their attention on an appraisal he completed for Longleaf, L.L.C. (Longleaf), in which he concluded that an easement on that property diminished its value by approximately 32%. That appraisal was used by both Mr. Almand and Mr. Ryan as a component of their percentage diminution analyses, described above. Petitioners contend that Mr. Ryan intentionally underestimated the value of the easement on Longleaf's property, which skewed the appraisals in the instant case.

The basis of petitioners' contention is their assertion that Mr. Ryan had a conflict of interest when he appraised Longleaf's property. Petitioners point out that Mr. Ryan has frequently appraised properties for the Nature Conservancy and that Longleaf purchased its property from the Nature Conservancy, providing Mr.

Ryan with an incentive to underestimate the impact of the easement so that Longleaf would overpay the Nature Conservancy for the property. Petitioners' contention is entirely conjectural and has no basis in fact.

The history of the property purchased by Longleaf is a little unclear. Originally, the land was part of a large tract owned by St. Joe Timberland Co., which sold a portion of that tract to the Nature Conservancy or the State of Georgia during December 2000. The Nature Conservancy subsequently placed a conservation easement on most or all of the property it purchased and transferred most or all of that property to the State of Georgia. Alternatively, all of the property may have been sold originally to the State of Georgia, and the Nature Conservancy may have subsequently purchased some of that property from the State. Eventually, a 1,219-acre portion of the property originally owned by St. Joe Timberland Co. came to be purchased by Longleaf.

According to Mr. Ryan's appraisal report of Longleaf's property, at the time of the appraisal during April 2002, Mr. Ryan understood that Longleaf would be purchasing the property from the State of Georgia and donating a conservation easement on the property to the Nature Conservancy. Although the record is unclear, it appears that Longleaf actually purchased the property from the Nature Conservancy. It is unclear whether Longleaf immediately donated a conservation

easement on the property or whether it took the property subject to an existing easement. Before Longleaf engaged Mr. Ryan, Longleaf and either the Nature Conservancy or the State of Georgia had apparently agreed that Longleaf would purchase the unencumbered property for $2,225,000 per acre, a price that both Mr. Ryan and Mr. Almand agreed was slightly lower than the market price of similar properties in the area. In his appraisal report, Mr. Ryan estimated that the before value of the 1,219-acre tract was $2,315,000, and he estimated that the conservation easement diminished that value by about 32%. It appears that Longleaf eventually consummated the sale at a price of $1,495,000.

Petitioners pointed to no evidence that shows that Mr. Ryan had a conflict of interest when he valued Longleaf's property or that his appraisal with respect to that tract was untoward. Firstly, at the time he completed his appraisal, it is unclear whether Mr. Ryan even knew that Longleaf would eventually purchase the property from the Nature Conservancy. Secondly, Mr. Ryan disclosed to Longleaf that the Nature Conservancy was one of his clients. He testified that he has frequently been hired by both the buyer and seller on the same transaction because he has a strong reputation in the appraisal community. Indeed, the strength of his experience and reputation are evident in his list of clients, and he has even been hired by the Georgia Land Trust, the same organization as COLT, the organization to which

petitioners donated their easement on Kolomoki Plantation. Thirdly and finally, as explained below, the appraisal report supports Mr. Ryan's estimate of the after value of the property.

Petitioners contend that two appraisal reports completed by Mr. Ryan during 2002 on nearby properties show that he undervalued the conservation easement on Longleaf's property. In contrast to his estimate of the diminution on Longleaf's purchase, Mr. Ryan estimated that conservation easements on two other properties he appraised during 2002 diminished the values of those properties by 59% and 62%. However, contrary to petitioners' contentions, an examination of those appraisal reports shows that Mr. Ryan arrived at different values for those conservation easements because of differences in the retained rights, especially the retained timber rights.

Mr. Ryan concluded that the conservation easements on all three properties reduced each to a "lower-end silvicultural tract". However, the values of timber that could be harvested on those three properties were very different. The conservation easement on the property that experienced 62% diminution required that the property achieve and maintain an average stocking of 7 million board feet, and even when the property had at least 7 million board feet of timber, the only harvesting permitted was an amount equal to the annual growth rate of the timber.

At the time the property was appraised, forestry experts opined that it would take 25 years for the timber on the property to reach 7 million board feet; Mr. Ryan wrote that, from an economic standpoint, the value of the property was "almost equivalent to a clearcut timber tract which must go through an extended holding period before timber stands reach maturity and ultimate merchantability." Similarly, the conservation easement on the property that experienced 59% diminution required the owner to maintain a minimum amount of timber on the land and restricted the amount of annual harvesting. Mr. Ryan estimated that that restriction encumbered 93% of the merchantable timber on the property.

In contrast, the conservation easement on Longleaf's purchase restricted only the amount of timber that could be harvested in the wetlands, approximately 28% of the property. The conservation easement did not restrict the amount of timber that could be harvested from the remainder of the property, requiring only that the property owner develop a management plan. Accordingly, Mr. Ryan estimated that the restrictions on silviculture with respect to Longleaf's property diminished the timber value by only 36%. Other than the differences related to the timber values, Mr. Ryan's appraisals with respect to the effect of the easements on each of those three properties were identical. Consequently, petitioners' argument that Mr. Ryan's disparate appraisal values reflect a desire to "cheat" Longleaf lacks merit.

Petitioners also contend that Mr. Ryan omitted what they refer to as the "Government Purchases" section from his appraisal reports for Longleaf and in the instant case. Petitioners contend that the "Government Purchases" section supports their appraisal values because it states that conservation easements exhibit diminution values in a "fairly consistent range between 50 and 70 percent". However, petitioners misquote Mr. Ryan and mischaracterize his reports.

In Mr. Ryan's two other appraisal reports from 2002, after reaching a conclusion about the value of the conservation easement, he appended a section titled "General Analysis of Government Acquired Conservation Easements" in which he wrote:

> As a follow-up to the previous analysis, an additional set of data has been considered. This data consists of 17 purchases of conservation easements by government entities. Generally, this is not viewed as a reliable set of data for direct comparison due to the wide variations between the initial land values, variations in the characteristics of the tracts and variations in the extent of the easements * * *. Because of these variations, considerable differences existed in the resultant residual prices and the prices per acre, which were paid for the actual easements. Furthermore, considerable differences existed in the percentage of fee simple value that were paid. However, the sales were considered appropriate for viewing from the standpoint of an overall check of reasonableness of the estimate of value utilized for the subject.

> The transactions cited for this section of the report represent conservation easements that were purchased by various government agencies in the State of Florida * * * over the past few years. These properties ranged in size from 190.8 to 32,134 acres and indicated residual values that ranged from $121 to

$1,027 per acre * * *. The prices paid for the easement acquisitions ranged from 27% to 97% of the total fee simple value (i.e., before value).

In initially analyzing these sales, the extremes representing the broad range were studied. These extremes were reflected by two sales. The highest percentage paid was for the tract which also had the lowest residual land value * * *. It consisted of a development tract that was left with essentially no rights except for passive enjoyment. The lowest percentage paid * * * was for the tract which had the highest residual value. It consisted of a large timber tract which included significant volumes of merchantable timber in both the before and after values.

Even after analyzing the extreme sale examples, the balance of the sale data in unique regard exhibits a broad spectrum in terms of residual unit value, actual dollar unit price paid for the conservation easement acquisition and that of resulting percentage of fee simple value paid for conservation easement rights. Analyzing this sale data from a statistical perspective, does however indicate a traditional "bell curve" situation. In other words, outside of the extreme examples, there tends to be a more general grouping of the sale data in terms of residual property value (on a per acre basis) and percent of fee simple value actually paid for the easement. This specific set of sale data, in my opinion, provides an ample source for a check of reasonableness in the ultimate estimation of value of the subject in a proposed after situation.

When analyzed in terms of percentage of the fee simple value estimate paid for the conservation easement, the vast majority of examples studied (21 of 31) exhibit a relatively consistent range of from 50% to approximately 70% of fee simple value (i.e., before value).

Read in context, that section does nothing to undermine Mr. Ryan's appraisals of Longleaf's property or Kolomoki Plantation. Indeed, Mr. Ryan noted in that section that the data show a "broad spectrum" of values and that fully one-third of the Government acquisitions he examined fall outside of the 50% to 70% range.

He explained that the percentage diminution depends heavily upon the residual rights retained by the property owners. In his report in the instant case and in his report for Longleaf, he carefully examined the retained rights and explained how those rights influenced his estimate of the after value. Moreover, even in the appraisal reports in which he included that section, it actually played no part in his estimate of the after value. Accordingly, we reject petitioners' contention that Mr. Ryan's omission of that section from his appraisal reports for Longleaf or in the instant case showed any bias.[28]

We found Mr. Ryan to be well qualified, and we considered him to be a credible witness.

---

[28]We also reject petitioners' suggestion that conservation easements diminish the value of the underlying property in a "fairly consistent range between 50 and 70 percent". That contention is inconsistent with the evidence in the record, including the appraisal of petitioners' own expert who estimated that the conservation easement on the encumbered portion of Kolomoki Plantation diminished its value by only 40%. Petitioners' contention is also at odds with our prior opinions in which we have emphasized that conservation easements do not have a uniform effect on the values of underlying properties and that those easements must be valued after considering facts such as the terms of the easement and the market conditions. See, e.g., Friedberg v. Commissioner, T.C. Memo. 2011-238; Scheidelman v. Commissioner, T.C. Memo. 2010-151; Nicoladis v. Commissioner, T.C. Memo. 1988-163. As Mr. Almand aptly explained in his report: "The magnitude of the effect of the surrendered rights depends on how much control is given up and whether or not they result in a change in the highest and best use of the property."

3.      Analysis and Conclusion

      a.      Estimating Market Appreciation

Mr. Almand estimated that comparable properties in the neighborhood of Kolomoki Plantation were appreciating at 6% annually during the relevant period whereas Mr. Ryan estimated that such properties were not appreciating at all. While we are convinced that properties were appreciating, for the reasons explained below, we think Mr. Almand overestimated the rate of appreciation.

Mr. Almand's estimate of the market appreciation was based upon a paired sale of a similarly sized tract near Kolomoki Plantation, four paired sales of similarly sized plantations near Thomasville, Georgia, and upon a study of sales of smaller acreage agricultural tracts near Kolomoki Plantation. There are a number of problems with Mr. Almand's analysis. Firstly, when he estimated the appreciation of properties that were bought in one year and sold several years later (the paired sales), he accounted for improvements to the properties by simply adding the costs of those improvements to the basis of those properties. That method for calculating market appreciation is unsound according to Mr. Almand's own report: he later stated, with respect to Kolomoki Plantation, that improvements such as cleaning up the property and improving wildlife habitat "generally enhance the value of the property more than [they] cost." Those are the

same types of improvements made on the only other nearby plantation property, and similar improvements may have been made on the Thomasville plantations though Mr. Almand did not provide any information about improvements the owners may have made. According to his own reasoning, Mr. Almand's estimate of appreciation on those properties is excessive.

Secondly, the four paired sales of other plantation properties were from the Thomasville, Georgia, area, which Mr. Almand acknowledged was a different market. He nonetheless defended his use of those properties by noting that the Thomasville market "attract[ed] a similar type of buyer." However, whether the Thomasville market attracted a similar type of buyer is irrelevant to whether market appreciation near Thomasville is a good barometer of appreciation near Kolomoki Plantation. Mr. Almand provided no other explanation for why he considered appreciation of properties near Thomasville to be similar to appreciation near Kolomoki Plantation.

Thirdly, the Thomasville paired sales and the study of appreciation on smaller properties do not apply to the same period as most of Mr. Almand's comparable sales. The Thomasville paired sales were purchased and held for the following years before being sold: 2003-2007; 2004-2007; 2004-2005; and 2000-2005. In contrast, Mr. Almand's comparable sales are from 2000, 2001, 2002, 2002, 2002, 2002,

2004, 2004, and 2006. Mr. Almand needed to adjust those sales to 2003 and 2004, but his Thomasville paired sales reflect appreciation that went beyond 2004 and, except in one case, started only in 2003 or 2004. Similarly, the study Mr. Almand found that measured appreciation on smaller agricultural tracts examined the period from 2000 to 2006. Although, as noted, there is scant information about appreciation in the market for plantation properties near Kolomoki, evidence about other markets shows that prices increased more rapidly during the mid-2000s than in the early part of the decade.

Fourthly, smaller agricultural tracts are a different market from large shooting plantations, and Mr. Almand did not explain why such a study provided an accurate measure of appreciation on shooting plantations. Mr. Ryan specifically noted that the rate of appreciation on shooting plantations was different from the rate on other rural properties during the relevant period.

Fifthly, Mr. Almand failed to make any adjustment for fluctuations in the price of timber. A timber report included with Mr. Almand's appraisal report indicates that timber appreciated at an annual rate of about 3% from 2000 through 2003. Depending upon how much timber contributed to the value of the plantation properties, omitting to adjust for such fluctuations could overstate appreciation on the land itself. Mr. Almand adjusted for fluctuations in timber prices when he

appraised Kolomoki Plantation; he should have done the same when he estimated the appreciation rate on the basis of sales of other properties.

On the basis of the foregoing, we conclude that Mr. Almand overestimated the rate of appreciation for plantation properties near Kolomoki Plantation during the relevant time period. However, we believe that his evidence shows at least some modest appreciation. Accordingly, we will adjust sale prices to reflect 3% annual appreciation.

## b. The Before Value of the 2003 Easement

Mr. Almand and Mr. Ryan used five of the same comparable sales. Those five comparable sales include the four comparable sales of properties that Mr. Almand considered most similar to the subject property. Because the parties agree on the comparability of those five sales and because we agree that those properties are the most similar to Kolomoki Plantation, we will use them as the basis for our calculation of the before value of Kolomoki Plantation. Mr. Almand and Mr. Ryan estimated the value of the "bare land" on those properties by subtracting the contributing value of various components of those properties as follows:

| ID[1] | Appraiser | Date | Size (acres) | Unadjusted $/acre | Personalty & quotas | Improve-ments | Timber | Bare land $/acre |
|------|-----------|------|-------|-----------|---------|--------|--------|
| A | Almand | 3/15/00 | 6,733 | $2,428 | $73 | $149 | $297 | $1,761 |
|   | Ryan |  |  |  |  | [2]297 | 446 | 1,685 |

| B | Almand | 7/15/02 | 6,186 | 2,350 | 58 | 32 | 307 | 1,953 |
|---|--------|---------|-------|-------|----|----|-----|-------|
|   | Ryan   |         | 6,175 | 2,354 | 58 | 29 | 228 | 2,039 |
| C | Almand | 8/19/02 | 2,716 | 3,130 | 98 | 239 | 736 | 2,057 |
|   | Ryan   |         |       |       | 98 | 239 | 736 | 2,057 |
| D | Almand | 8/19/02 | 1,654 | 2,267 | 167 | 266 | 227 | 1,607 |
|   | Ryan   |         |       |       | [3]167 | 270 | 227 | 1,603 |
| E | Almand | 10/1/02 | 4,404 | 2,793 | 159 | 125 | 332 | 2,177 |
|   | Ryan   |         |       |       | 173 | 240 | 341 | 2,039 |

[1]The "ID" field contains letters which we have assigned to each of the comparable sales for convenience.

[2]For comparable sale A, Mr. Ryan lumped together the contributions from personalty, allotments, and improvements.

[3]Mr. Ryan did not separate contributions from personalty and improvements, but we have separated them and adjusted his figures to match the categories in the table.

For properties C and D, both appraisers arrived at nearly identical conclusions about the bare land value of the properties. For property D, we will use Mr. Almand's figure for the value of improvements and the total price per acre for the land because Mr. Almand's calculations use more precise information about the values of personalty and improvements. For the remaining three properties, more analysis is required.

For property A, neither of the appraisers was able to ascertain exact figures for the values attributable to improvements or timber. Mr. Ryan estimated that the timber was valued at $3 million and improvements, personalty, and allotments at $2 million. Although Mr. Almand was able to acquire more exact information

about the peanut allotment, which he reported to be $488,873, he was able to provide only rough estimates of the value of timber and personalty, which he estimated to be worth $2 million and $1 million, respectively. He provided no estimate for the value of other improvements, and his numbers fail to account for $1 million.[29] Because of that discrepancy, we will use $2 million as the value of improvements, personalty, and allotments, and $2.6 million as the value of timber.[30] We therefore estimate that the value of the bare land is $11,750,000, which is $250,000 more than Mr. Ryan's estimate and $111,000 less than Mr. Almand's. The price per acre of bare land for property A is therefore $1,745.

For property B, Mr. Almand and Mr. Ryan agreed that the price paid for the property was $14,537,225, they agreed that the sale included allotments valued at approximately $360,000, and they agreed that the improvements contributed

---

[29]Mr. Ryan and Mr. Almand agree that the property sold for $16,350,000. Mr. Almand estimated that the bare land value was $11,861,127; that the value of timber was $2 million; that the value of personalty was $1 million; and that the value of the peanut allotment was $488,873. The sum of those values is $15,350,000, which is $1 million shy of the sale price.

[30]Those numbers represent a $500,000 to $600,000 increase to Mr. Almand's estimates of the value of timber and the value of improvements, personalty, and allotments. In the end, those numbers bring Mr. Almand's estimate of improvements, personalty, and allotments in line with Mr. Ryan's and approximately split the difference between their estimates of the timber value. The record provides no reason to favor one appraiser's estimates over the other's: they both verified the transaction with the same parties.

approximately $30 per acre to the sale price.  However, they disagreed about the value attributable to timber.  Mr. Almand stated that the timber was worth $1,900,000, or $307 per acre, and Mr. Ryan stated that it was worth $1,410,000, or $228 per acre.  Mr. Almand relied on the selling broker and the appraiser for his data, but Mr. Ryan relied on a "knowledgeable third party".  Because we consider Mr. Almand's source more reliable, we will use Mr. Almand's numbers for property B.

For property E, the appraisers disagreed about the values of timber, personalty, allotments, and improvements associated with Kolomoki Plantation. Both of them relied on third parties for their information:  Mr. Almand relied on several local appraisers and the property manager, and Mr. Ryan relied on an unidentified "knowledgeable third party".  Mr. Ryan reported that the timber was valued at approximately $1,500,000, but Mr. Almand reported that the value was $1,461,000, which he said was based on a cruise[31] at the time of the sale.  Because Mr. Ryan's number is simply Mr. Almand's number rounded, we will use Mr. Almand's number.  Mr. Almand reported that the allotments had been sold to the Government before the sale of the property, and Mr. Ryan reported that the peanut

---

[31]A timber cruise is a method of surveying the timber in a particular area to estimate species composition, volume, grade, etc.  See Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1992-407.

allotment was $62,000, or approximately $14 per acre. That amount explains the difference between the appraisers' estimates of the value attributable to personalty and quotas. We will accept that the peanut allotment was not part of the sale and therefore will use Mr. Almand's value for the contribution of personalty, $159 per acre. Mr. Ryan and Mr. Almand provided very different numbers for the value of improvements on the property. They provided similar descriptions of the improvements on the property, but Mr. Ryan stated that the property included six tenant houses whereas Mr. Almand said it had only one. We will assume that the property manager to whom Mr. Almand spoke was familiar enough with the history of the property that he knew how many tenant houses were on the property in 2002 when the sale took place. Accordingly, we will use Mr. Almand's figure for the value of improvements.

On the basis of the foregoing, we will use the following sales of comparable properties to estimate the before value of Kolomoki Plantation:

| ID[1] | Date | Size (acres) | Unadjusted $/acre | Personalty & quotas | Improve- ments | Timber | Bare land $/acre |
|---|---|---|---|---|---|---|---|
| A | 3/15/00 | 6,733 | $2,428 | $73 | $224 | $386 | $1,745 |
| B | 7/15/02 | 6,186 | 2,350 | 58 | 32 | 307 | 1,953 |
| C | 8/19/02 | 2,716 | 3,130 | 98 | 239 | 736 | 2,057 |
| D | 8/19/02 | 1,654 | 2,267 | 167 | 266 | 227 | 1,607 |
| E | 10/1/02 | 4,404 | 2,793 | 159 | 125 | 332 | 2,177 |

[1]The "ID" field contains letters which we have assigned to each of the comparable sales for convenience.

For the reasons explained above, we will adjust those prices to December 2003 prices using an annual appreciation rate of 3%.

On the basis of a study completed by a forester, Mr. Almand estimated that the value of timber on Kolomoki Plantation during December 2003 was $978,175, or approximately $175 per acre.  Unfortunately, the forester who provided that estimate did not actually conduct a cruise of the property during 2003 but rather provided a retrospective estimate based upon an earlier cruise, growth rates, and some information about acreage that had been depleted and other acreage that had been planted.  Mr. Ryan did not provide a numerical estimate of the value of the timber on Kolomoki Plantation, instead characterizing it as "typical" for properties in the area.  Although Mr. Almand's estimate of the timber is imperfect, it is the best evidence available, and we have no reason to doubt that it provides an acceptable estimate of the timber's value during December 2003.  Accordingly, we will use $175 per acre to adjust the bare land prices to reflect the value of timber on Kolomoki Plantation.

Mr. Almand calculated that the total value for all improvements on Kolomoki Plantation during December 2003 was $1,330,000, or $237 per acre.  He used that

estimate to adjust the prices of his comparable sale properties. In contrast, Mr.

Ryan excluded the value of improvements from his estimate of the before value

because he stated that the improvements were not affected by the conservation

easement. In the table below, we provide the price per acre for each of the sales

of comparable properties adjusted for improvements and timber and adjusted

only for timber:

| ID[1] | Date | Bare land $/acre | Land apprec.[2] | Timber | Adjustment less improv. | Improve-ments | Adjustment with improv. |
|---|---|---|---|---|---|---|---|
| A | 3/15/00 | $1,745 | $205 | $175 | $2,125 | $237 | $2,362 |
| B | 7/15/02 | 1,953 | 89 | 175 | 2,217 | 237 | 2,454 |
| C | 8/19/02 | 2,057 | 77 | 175 | 2,309 | 237 | 2,546 |
| D | 8/19/02 | 1,607 | 60 | 175 | 1,840 | 237 | 2,077 |
| E | 10/1/02 | 2,177 | 82 | 175 | 2,434 | 237 | 2,671 |

[1]The "ID" field contains letters which we have assigned to each of the comparable sales for convenience.
[2]As explained above, the values in this column reflect adjustment for annual appreciation of 3%.

The average of those five comparable sales, excluding improvements, is $2,185. Or,

excluding property D, which both appraisers agreed was inferior to Kolomoki

Plantation, the average is $2,271. On the basis of those numbers, we conclude that

the 2003 before value of Kolomoki Plantation was $2,300 per acre, excluding

improvements, or $2,537 per acre including improvements. Accordingly, the total

2003 before value, excluding improvements, was $12,880,000.

c.     The After Value of the 2003 Easement

Mr. Almand and Mr. Ryan reached similar conclusions about the conservation easement's effect on Kolomoki Plantation:  Mr. Almand estimated that it diminished the value of the encumbered portion of the property by 40%; Mr. Ryan estimated 30%.  Both appraisers employed the percentage diminution approach, and Mr. Almand relied entirely upon that method.

Mr. Almand considered the impact of conservation easements on seven different sales in southern Georgia or northern Florida.  He considered the effect of the conservation easements on each of those properties, reporting that they diminished the values of the underlying properties by 30% to 60%.  Contrary to petitioners' contention that the transaction between Longleaf and the Nature Conservancy was the only transaction that supported a diminution in value of 30%, five out of seven of the conservation easements considered by Mr. Almand had at least some evidence indicating that the conservation easement diminished the value of the underlying property by less than 40%.  Mr. Almand compared many of the encumbered properties to more than one sale of a similar unencumbered property in order to estimate the diminution in value.  Mr. Almand's method was more thorough than Mr. Ryan's insofar as Mr. Ryan only considered the effect of a conservation easement on two properties when he applied the percentage

diminution approach. We found Mr. Almand's analysis to be sound and his reasoning persuasive. Accordingly, we accept Mr. Almand's conclusion that the 2003 conservation easement diminished the value of the encumbered portion of Kolomoki Plantation by 40%.[32]

However, when Mr. Almand applied that percentage diminution to arrive at an after value, he made an error because he also applied it to the value of improvements on Kolomoki Plantation, which were unaffected by the conservation easement. He acknowledged that error during his testimony at trial. We will apply the diminution only to the value of the property excluding improvements. Reducing the before value of $2,300 per acre by 40% yields a value of $1,380 per acre. That value applies to 1,780 acres while the value of the remainder is unchanged. Accordingly, we conclude that the value of Kolomoki Plantation after the contribution of the 2003 easement was approximately $11,242,400. The value of the 2003 easement was therefore approximately $1,637,600.

### d. The Before Value of the 2004 Easement

Mr. Almand and Mr. Ryan disagreed about whether the mitigation bank was in place during 2004. Because he believed that it was, Mr. Ryan increased his 2004

---

[32]As further confirmation of the reasonableness of the value reached by applying a 40% diminution, that value is consistent with the value Mr. Ryan reached when he applied his revised sales comparison approach.

before value to reflect his estimate of the mitigation bank's contribution to the property's value. We need not decide whether the mitigation bank was in place because whatever effect its value might have on Kolomoki Plantation would increase both the before and after value and therefore would have little effect on the value of the conservation easement in dispute. In the interests of simplicity, therefore, we will assume that the mitigation bank was not in place during 2004 and we will value Kolomoki Plantation without considering it.

Mr. Almand estimated the 2004 before value by adjusting the 2003 after value to reflect market appreciation, timber harvesting and growth, and fluctuations in the price of timber. However, he made several minor errors when he did so. Firstly, instead of adjusting only the price per acre of bare land to reflect market appreciation, he actually adjusted the price per acre for the entire property, including timber. That calculation overstated the appreciation. He then separately adjusted the value of timber to reflect market fluctuations in the price of timber. However, when he made that adjustment, he neglected to consider that the conservation easement had already decreased the value of the timber on the encumbered portion of the property because it placed some restrictions on the timber that could be harvested (i.e., timber could be harvested only according to the

management plan and no timber harvesting could be detrimental to the scenic value of the property or to the wildlife habitat). Although the value of timber on the property decreased as a result of harvesting and falling timber prices, approximately one-third of that timber was on land encumbered by the conservation easement, and its value had already been somewhat diminished. Mr. Almand's calculation therefore slightly overstated the loss in value from falling timber prices.

To accurately determine the 2004 before value, we will adjust the 2003 before value of only the bare land to reflect market appreciation, and we will then add to that value Mr. Almand's estimate of the 2004 timber contribution ($169 per acre, $6 per acre less than the 2003 value). Finally, we will apply the 40% diminution value to 1,780 acres, reflecting the effect of the 2003 conservation easement. Conducting those calculations results in a 2004 before value of approximately $2,058 per acre, or approximately $11,524,800.

e. The After Value of the 2004 Easement

Both Mr. Almand and Mr. Ryan applied the same percentage diminution to the portion encumbered by the 2004 easement as they did to the portion covered by the 2003 easement. We agree with both appraisers that the diminution in value will

be approximately the same for the 2004 easement. To calculate that value, we will again begin with the 2003 before value for just the bare land. We will adjust that value to reflect market appreciation during 2004, and we will add Mr. Almand's estimate of the timber contribution. We will then apply a diminution of 40% to 4,230 acres, approximately 75.5% of the property, which is the area covered by either the 2003 or 2004 conservation easement. Accordingly, we conclude that the 2004 after value is $1,645 per acre, or $9,212,000. The value of the 2004 conservation easement is therefore $2,312,800.

Issue 5. Whether Petitioners Are Liable for the Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations, or a substantial understatement of income tax. Section 6662(d)(1)(A) defines "substantial understatement of income tax" as an amount exceeding the greater of 10% of the tax required to be shown on the return or $5,000. Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must produce sufficient evidence indicating that it is proper to impose penalties. Higbee v. Commissioner, 116 T.C. at 446. However, once the Commissioner has met the burden of production, the burden of

proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority. Id. at 446-447.

To the extent that petitioners' tax liabilities following the redeterminations made by the Court still exceed 10% of the tax required to be shown on their returns, respondent has met his burden of production.

The accuracy-related penalty under section 6662(a) is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the taxpayer's experience, knowledge, and education. Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. Reliance on professional advice may constitute reasonable cause and good faith, but only if, considering all the circumstances, such reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause exists where a

taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners presented evidence that throughout the process of donating the conservation easements and preparing their tax returns, they relied upon Mr. Rothschild and Mr. Johnson, their longtime attorney and accountant, respectively. They also engaged Conservation Advisors, who helped them select the appraisers Mr. Roberts and Mr. Clark. Both of those appraisers were qualified and had experience appraising conservation easements. From the appraisal reports they prepared, it is evident that they both had access to sufficient information to value the conservation easements. We conclude that petitioners had reasonable cause and acted in good faith with respect to their underpayment in each year. Accordingly, we hold that petitioners are not liable for the accuracy-related penalties.

In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.